IN THE MATTER OF THE WILL OF EDNA EARL MAYNARD, DECEASED

No. 8210SC839

(Filed 4 October 1983)

1. **Bills of Discovery § 1; Witnesses § 1.4— calling witness not listed in pretrial order—testimony not suppressed—no abuse of discretion**

Inasmuch as the trial judge offered the propounders of a will a reasonable time to consider and meet surprise testimony regarding the validity of the will, the trial judge did not abuse his discretion in denying the propounder's request for a three weeks' continuance.

2. **Bills of Discovery § 1— admission of contract into evidence—not listed as exhibit in pretrial order—no abuse of discretion**

The trial court did not abuse its discretion by admitting into evidence a contract between one of the propounders of a will and the testatrix on the ground that it was not listed as an exhibit in the pretrial order since (1) the propounders did not make a timely objection to the evidence of the contract in that they only objected after it had been fully discussed by the witness on cross-examination, and (2) the evidence indicated that both the will and the contract were prepared by the same law firm, of which the executor of the will and his counsel in this proceeding were members, and a deceased member of the firm had been the testatrix's attorney for decades.

3. **Wills § 24.1— caveat proceeding—refusal to set aside verdict—no abuse of discretion**

A trial judge's refusal to grant a motion to set aside the verdict in a caveat proceeding in which the jury found that the testatrix had sufficient mental capacity to make and execute a will did not constitute an abuse of discretion where the evidence was squarely in conflict and where the propounders presented substantial credible testimony as to the testamentary capacity of the testatrix.

4. **Wills § 22— testamentary capacity as differing from mental capacity to handle affairs—rebuttable presumption that one under guardianship lacks testamentary capacity**

Testamentary capacity differs from the mental capacity to manage one's affairs, and a person who has been declared incompetent may subsequently have the testamentary capacity to execute a will. There is only a *rebuttable* presumption that one under guardianship lacks testamentary capacity. Therefore, even though evidence was introduced that the testatrix was adjudged incompetent for want of understanding to manage her affairs by reason of mental and physical weakness on account of hardening of the arteries, congestive heart failure, emphysema, and high blood pressure and a mental condition connected therewith, the fact that approximately nine months later the testatrix executed a will and revoked a prior will did not conclusively establish that she lacked mental capacity since the caveators presented evidence that the testatrix had sufficient mental capacity to execute a valid will, that she knew the natural objects of her bounty, that she knew who her children were

and knew the nature and extent of her property and the legal consequences of making a will. Whether the testatrix's mental capacity was sufficient to rebut the presumption of incapacity was a question for the jury to determine.

**5. Appeal and Error § 31.1— failure to object to the charge—applicability of "plain error" rule to civil appeal**

The propounders of a will failed to follow App. R. 10(b)(2) by offering no objection to any portion of the jury charge or omission therefrom before the jury entered to consider its verdict, and assuming the "plain error" rule for appellate review applies to civil actions, the doctrine is available to remedy only those unusual trial errors so contrary to fundamental fairness as to amount to a denial of the litigant's due process right to a fair and impartial trial. The alleged errors in the caveat proceeding regarding the instructions on testamentary capacity and undue influence do not reach the dimensions of an unconstitutional deprivation of the propounders' right to a fair and impartial trial, nor are the alleged errors "fundamental error[s], something so basic, so prejudicial, so lacking in its element that justice cannot have been done."

APPEAL by propounders from *Lee, Judge.* Judgment entered 25 March 1982 in Superior Court, WAKE County. Heard in the Court of Appeals 20 May 1983.

This is a caveat proceeding in which the caveators seek to set aside and annul probate of the will of Edna Earl Maynard dated 28 April 1977 and have admitted to probate a subsequent will dated 13 November 1979.

The testatrix, Edna Earl Maynard, died on 15 January 1981 at the age of 77. She was survived by her five adult children: Walter Troy Maynard (Troy), Edna Maynard Grubbs (Edna), Mildred Maynard Dawson (Mildred), Raymond Amos Maynard (Raymond), and Ruby Roselle Maynard (Ruby). On 28 April 1977, Edna Earl Maynard executed a will in the office of her attorney of many years, William T. Hatch (hereafter referred to as the 1977 will), which left her property equally to her five children. At the time the 1977 will was executed, Mrs. Maynard was approximately 73 years old. Nearly two years later, on 21 February 1979, Mrs. Maynard was adjudged incompetent from want of understanding to manage her affairs, and a guardian was appointed for her. No proceeding to restore Mrs. Maynard to competency was instituted prior to her death in 1981. On 13 November 1979, the testatrix was taken to the office of Attorney Carl Holleman of Apex, and there executed a will which Mr. Holleman had prepared at her request (hereafter referred to as the 1979 will). The 1979 will expressly revoked the 1977 will and left Mrs. Maynard's property to

only three of her five children, Ruby, Raymond and Mildred, leaving nothing to Edna and Troy. Shortly after her death, Mrs. Maynard's second guardian, Larkin Kirkman, delivered both the 1977 will and the 1979 will to the Clerk of Superior Court of Wake County. The Clerk admitted the 1977 will to probate in common form on 21 January 1981. On 3 February 1981, the 1979 will was presented for probate by Carl Holleman, the alternate executor named in that will.

This action was initiated by Ruby Maynard and Raymond Maynard on 13 August 1981, by the filing with the Clerk of Superior Court of Wake County of a caveat and petition for Probate of Will in Solemn Form. In their petition, the caveators alleged that the 1977 will had been revoked by the 1979 will and that the 1979 will was the last will and testament of Edna Earl Maynard. In the ensuing caveat proceeding, the propounders were Harold W. Berry, Jr., Executor of the 1977 will, Edna Grubbs, Walter Maynard, Mildred Dawson, and the caveators were Ruby Maynard and Raymond Maynard.

This action was tried before a jury. Both parties presented extensive evidence and after arguments by counsel, the following issues were submitted to and answered as follows by the jury:

1. Was the paper writing dated April 28, 1977, executed by Edna Earl Maynard according to the requirements of the law for a valid Last Will and Testament?

Answer: No.

2. Was the paper writing dated November 13, 1979, executed by Edna Earl Maynard according to the requirements of the law for a valid Last Will and Testament?

Answer: Yes.

3. At the time of the signing and executing the paper writing dated November 13, 1979, did Edna Earl Maynard have sufficient mental capacity to make and execute a valid Last Will and Testament?

Answer: Yes.

4. Was the execution of the paper writing dated November 13, 1979, procured by undue influence?

Answer: No.

5. Is the paper writing dated November 13, 1979, and every part thereof, the Last Will and Testament of Edna Earl Maynard?

Answer: Yes.

6. Is the paper writing dated April 28, 1977, and every part thereof, the Last Will and Testament of Edna Earl Maynard?

Answer: No.

The propounders' motion to set aside the verdict as contrary to law and against the greater weight of the evidence, and for a new trial, was denied. From judgment entered upon the verdict for the caveators, the propounders appeal.

*Hatch, Little, Bunn, Jones, Few & Berry, by David H. Permar, for propounder appellant Harold Berry.*

*David R. Cockman, for propounder appellants Mildred M. Dawson, Edna M. Grubbs, and Walter Troy Maynard.*

*Ransdell, Ransdell & Cline, by William G. Ransdell, Jr. and James E. Cline, for caveator appellee Ruby Maynard.*

*Parker, Sink, Powers, Sink and Potter, by Henry H. Sink, for caveator appellee Raymond Maynard.*

JOHNSON, Judge.

The issues to be decided by this appeal are (1) whether the court erred in denying the motion to set aside the verdict and for a new trial on the grounds that (a) the prior adjudication of Mrs. Maynard's incompetency raised a conclusive presumption that the testatrix lacked testamentary capacity on 13 November 1979, (b) that the evidence showed the testatrix to be laboring under an insane delusion, and (c) because the propounders were unfairly surprised at trial; (2) whether the court's instructions to the jury properly declared and explained the law arising on the evidence and correctly charged the jury on the issues of testamentary capacity and undue influence; and (3) whether the court erred in admitting into evidence certain testimony and exhibits which were not listed in the pretrial order. For the reasons set forth below, we find no error in the rulings of the trial court.

The key factual issues at trial were whether the testatrix had sufficient mental capacity on 13 November 1979 to make and execute a valid will, whether Mrs. Maynard changed her will because she suffered under the insane delusion that her son Troy was trying to harm her, or because she was of the opinion that Troy and her daughter Edna had already received their portion of her estate; and whether the making and execution of the 1979 will was procured through the undue influence Ruby Maynard exerted over her mother, Edna Earl Maynard, in the months just preceding November, 1979.

The evidence presented at trial may be summarized as follows: The testatrix, Edna Earl Maynard, was born in 1903. Her husband, Walter A. Maynard, died intestate in 1936, leaving as the bulk of his estate approximately 80 acres of land in Cary, North Carolina. Mrs. Maynard was 32 years of age at the time of her husband's death and had little formal education. Following the death of her husband in 1936, Attorney William T. Hatch of Raleigh became Mrs. Maynard's legal advisor, and remained in that capacity for approximately 40 years. Mrs. Maynard and her husband had five children, all of whom survived Mrs. Maynard.

In 1954, the testatrix's son, Troy, instituted a special proceeding to have his portion of his intestate father's estate allotted to him by setting off his mother's dower right. The other children of the testatrix borrowed money to pay Troy for his share of the property. Troy received somewhat less than $2,000, which he testified did not represent his share of his mother's estate. In 1955, the other children deeded their interest in the property to the testatrix.

Edna M. Grubbs testified that from the time she was married in 1945 she regularly visited her mother, that she looked after her mother's business affairs, and wrote all of her mother's checks up until about 1976 when William Hatch began to act under a power of attorney for Mrs. Maynard. In 1970, the testatrix gave by deed 2.7 acres of land to her grandson Thomas Grubbs, the son of Edna M. Grubbs. Thomas was supposed to live on this land near the testatrix; however, shortly thereafter he sold it to the Masons for a temple site. Mrs. Grubbs testified that this gift was made against her advice, that it was not to represent her share of her mother's estate and that Edna Maynard had never stated that the

conveyance to Thomas Grubbs was to represent Mrs. Grubbs' share of the estate.

The testatrix' physical health had been deteriorating for many years before her death. She had emphysema, a heart condition, hypertension, and arteriosclerosis. She was hospitalized for a period in 1976 and 1977.

On 28 April 1977, Mrs. Maynard executed a will in the office of William Hatch, who had drafted the instrument for her. On that same date, testatrix executed a contract with her son Troy. The contract was also drafted by Attorney Hatch, and it provided that Troy and his wife Marlene would care for the testatrix for the rest of her life, in exchange for which the testatrix "has this day formally executed her last will and testament in which she devised and bequeathed to the parties of the first part [Troy and wife] her home residence, including house and 2.2 acres of land located at 1140 East Maynard Road, Cary, North Carolina, together with household furnishings . . ." At about this time, Troy and his wife Marlene moved next door to Mrs. Maynard, and they helped look after her until they moved away.

The 1977 will offered for probate by the propounders, however, had no provision therein for Troy and his wife to have the house and lot. Rather, it provided that the five children would share their mother's estate equally. On cross-examination, Troy admitted having signed the contract to assure that he "might get a little something for going out there" (to live by his mother), but denied being surprised by the fact that the 1977 will failed to contain the provision called for by the contract executed that same day.

The 1977 will consisted of four pages, the first two setting out the dispositive provisions and the fourth page being the executed signature page. The third page of this will was a blank signature page dated 1978. The propounders presented testimony by John McLain, an attorney in the Hatch firm, and Wendy Hicks, a legal secretary, both of whom were attesting witnesses, that the 1977 will was duly and properly executed by Mrs. Maynard. Thereafter, the caveators were allowed to present the testimony of James Durham, an examiner of questioned documents, despite the fact that Durham was not listed as a witness in the pretrial order. Over the propounders' objection Durham testified that the

fourth page (executed signature page) of the 1977 will was not typed at the same time, nor on the same typewriter as were pages one, two and three.

There was considerable strife between testatrix' children Ruby and Raymond on one side and her other children, Troy, Edna and Mildred on the other. At various times, different children would help care for testatrix. At times, relations were also strained between testatrix and her children, with long intervals of noncommunication between the various family members. Edna Grubbs testified that between 1972 and 1976, Ruby did not visit her mother.

Mrs. Grubbs testified further that in late 1978 or early 1979, a dispute developed between Raymond Maynard and Mrs. Maynard's attorney-in-fact, William Hatch, over sums of money that Raymond sought from his mother and that, as a result, Mrs. Maynard revoked Hatch's power of attorney. Further, that because she was concerned that her mother was easily swayed and would dissipate her funds, Edna Grubbs filed a petition before the Clerk of Wake County on 2 February 1979, seeking to have the testatrix declared incompetent to handle her affairs and seeking the appointment of a guardian.

The guardianship petition detailed Mrs. Maynard's physical and mental weaknesses. Pursuant to this petition, a hearing was held on 21 February 1979, and those party to and present at the hearing included each of the five children who were later parties to the caveat proceedings that are the basis of this appeal. At the hearing, the jury found Mrs. Maynard to be incompetent. A judgment was entered, stating that in consequence of "hardening of the arteries, congestive heart failure, emphysema, and high blood pressure and a mental condition connected therewith," Mrs. Maynard was "incompetent for want of understanding to manage her affairs by reason of mental and physical weaknesses on account of said diseases," and S. Johnson Howard was appointed as guardian for her.

Attorney Howard testified for the propounders that during his tenure as guardian, Mrs. Maynard was too weak and feebleminded to take care of herself, that she was often confused and that she was easily swayed to agree with whomever she had last spoken with. He also noted that at times Mrs. Maynard was

pleased that her son Troy was taking care of her, but that at other times she would demand that Troy be moved out of the house. Often at these times, she would accuse Troy of attempting to harm her, which Howard testified that he knew from his own knowledge to be patently untrue.

The propounders offered further evidence tending to show that their mother's mental condition did not improve prior to her death, that she remained easily confused and easily swayed and that, in the opinion of the various witnesses, Mrs. Maynard did not have sufficient mental capacity to execute a will during the period of time following the incompetency proceeding in February of 1979 and before her death in 1981.

Attorney Howard shared office space with Attorney David Cockman, who represented Mrs. Grubbs as petitioner in the competency proceeding, and who represents Mrs. Grubbs and Troy and Mildred, propounders of the 1977 will, in the present action. Ruby and Raymond, caveators, retained Attorney Brian Howell to represent them insofar as their mother's interests were concerned. They determined that Howard should not serve as guardian for the testatrix in view of Howard's relationship with David Cockman. Subsequently, Howard did resign as guardian and Attorney Larkin Kirkman was appointed successor guardian on 9 October 1979.

Larkin Kirkman's testimony concerning Mrs. Maynard's expressions of fear of her son Troy corroborated that of Mr. Howard. Kirkman termed this fear an "irrational fixation" and testified that he was confronted by demands from Mrs. Maynard that Troy and his wife be removed from her property and that he had received letters from Mrs. Maynard to that effect. However, as to Mrs. Maynard's mental and physical condition in general, Kirkman testified that when he was appointed successor guardian in October, 1979, his initial visit found Mrs. Maynard coherent and able to express her needs and desires intelligently. In Kirkman's opinion, Mrs. Maynard also possessed sufficient mental capacity to execute a valid will on 13 December 1979. Kirkman also testified that during the spring and summer of 1980 he had observed Mrs. Maynard get out in her garden. Further, that she could can vegetables and had, at that point, lived alone for a substantial period of time.

Sometime prior thereto, in August or September of 1979, Ruby Maynard had moved in with her mother, and she remained there until 20 April 1980 when her mother began living alone again. During that period, Ruby was the only child to have any sustained contact with Mrs. Maynard or with Larkin Kirkman. The other children, especially Mrs. Grubbs, Mildred and Troy, testified that they found it difficult to visit their mother and were told not to visit her without Kirkman's permission. During this period and afterwards, Ruby prepared her mother's meals, saw that she took her medicine, bought her groceries, did her laundry and transported her wherever she went. In some cases, Ruby composed her mother's letters and notes and made suggestions as to how they should be stated. Of the children, Kirkman dealt primarily with Ruby.

In late October, 1979, Kirkman received a note from Mrs. Maynard which expressed her desire to revoke the 1977 will and make another one. Kirkman also met with Mrs. Maynard in person to discuss this request. He advised her that, as her guardian, he would arrange for her to receive advice about preparing a new will from another attorney.

On 31 October 1979, Mrs. Maynard requested that Carl Holleman draft a will for her. Mr. Holleman visited the testatrix in her home and had a lengthy discussion with her in regard to the will and other matters. The parties were apparently concerned about the effect of the prior adjudication of incompetency on Mrs. Maynard's ability to revoke the 1977 will and validly make and execute a new will. The institution of a proceeding to restore Mrs. Maynard to competency was considered, but was never begun because the Clerk of Superior Court had advised against it.

On 13 November 1979, Ruby took Mrs. Maynard to Holleman's office and left her off. Mrs. Maynard executed the will Holleman had prepared for her. Holleman and other witnesses for the caveators testified that Mrs. Maynard had indicated to them that she provided in the later will for only three of her five children (Raymond, Ruby and Mildred) because the other two (Troy and Edna) had already received their share. The caveators' witnesses each testified further that, in their opinions, Mrs. Maynard had testamentary capacity on 13 November 1979. After

execution of the 1979 will, Mrs. Maynard's health continued to deteriorate, and she died on 15 January 1981.

We now turn to the questions presented by this appeal, which we will discuss in order of convenience.

I

The propounders assign error to the trial court's admission into evidence of James Durham's testimony and the contract executed by Troy and Mrs. Maynard on the grounds that they were not listed on the pretrial order, raised issues not previously raised by the pleadings and, therefore, constituted unfair surprise to the propounders.

The record discloses that following the cross-examination of Troy Maynard regarding his lack of surprise that the 1977 will did not conform to the provisions of the 1977 contract, it apparently occurred to caveator Ruby Maynard's attorney, William Ransdell, that the various pages of the 1977 will admitted to probate may have been switched or tampered with. This would explain the puzzling blank signature page dated 1978, appearing between pages two and four, as well as the dissimilarity in type between pages one through three on the one hand, and the executed signature page four, on the other. The next day, Attorney Ransdell moved to offer the testimony of James Durham as an expert on the identification of documents. Ransdell contended that Durham's testimony would tend to prove that the writing dated 28 April 1977 had been tampered with and was not, therefore, the last will and testament of Edna Maynard.

Counsel for the propounders of the 1977 will objected to the testimony of Mr. Durham on the grounds that the witness was not listed on the pretrial order and the propounders were not prepared to cross-examine the witness or respond to the issue raised by his testimony. Further, that the only issue raised by the petition was whether the 1977 will had been revoked by the subsequent 1979 will. An exchange occurred between counsel and the court on the question of whether the filing of the caveat itself raised the issue of whether the probated 1977 will was the last will and testament of Edna Maynard. Counsel for the propounders then stated that if the court were to grant the caveators' motion, propounders would move for a three week continuance to enable

them to investigate and rebut the evidence. The motion for a three week continuance was denied. However, the court did advise the propounders that, "if you needed some time to respond to it if it were admitted, that would be reasonable." Subsequently, the court again indicated that the propounders would be given a reasonable amount of time to respond to the Durham testimony, stating:

> The objection to the evidence is overruled. I am going to let it in before the jury. I think it is competent as to the will in every part, is this the last will and testament of Edna Earl Maynard and I am going to have to let it in. If you need a reasonable time to respond—certainly I am not going to continue the trial for any period of any week.

The record is devoid of any acceptance by the propounders of the court's offer of reasonable additional time to meet the evidence. By their assignments of error, propounders argue that by denying their motion for a three week continuance and motion for a new trial, made in part on the basis of the unfair surprise of Mr. Durham's testimony, the trial court abused its discretion, thereby entitling propounders to a new trial.

[1] The propounders correctly contend that where a party is surprised by the calling of witnesses who were not listed in the pretrial order, and the  party is not prepared to cross-examine these witnesses or present rebuttal witnesses, a motion for a continuance is appropriate. *State v. Hoffman*, 281 N.C. 727, 735, 190 S.E. 2d 842, 848 (1972). However, such testimony need not be suppressed. The admissibility of that testimony is a matter resting in the discretion of the trial judge, not reviewable on appeal in the absence of a showing of abuse. *Id.; State v. Anderson*, 281 N.C. 261, 188 S.E. 2d 336 (1972). We find no abuse of discretion by the admission of Mr. Durham's testimony into evidence. The pleadings in this caveat proceeding adequately raised the general issue of the due execution and validity of the 1977 will, despite the fact that the primary basis of the will contest was the alleged revocation of the 1977 will by the subsequent 1979 will.

A motion for a continuance is also addressed to the sound discretion of the trial judge and his ruling thereon is not reviewable in the absence of manifest abuse of discretion. 12 Strong's N.C. Index 3d, Trial, § 3.1. The trial judge offered the

propounders a reasonable time to consider and meet the surprise testimony regarding the validity of the 1977 will. The propounders did not avail themselves of that opportunity, but rather sought a continuance of three weeks, which was unreasonable in the context of the nearly completed trial and in relation to the issue raised. Inasmuch as the trial judge offered the propounders a reasonable continuance, denial of a three week continuance was not an abuse of discretion.

[2]  The propounders also assign error to the trial court's admission of the contract between Troy Maynard, one of the propounders and the testatrix, on the grounds that it was not listed as an exhibit in the pretrial order. This contract bears the same execution date as the will offered by the propounders, and calls for a provision in the testatrix' will to leave 2.2 acres and her home to Troy. Apparently the caveators argued to the jury that because there was a contradiction between the 1977 will offered for probate and the contract, the 1977 will, although bearing the date 28 April 1977 on its execution page, must have been written at a later date. The propounders argue that they were unfairly surprised by this evidence, and that, with sufficient opportunity, they would have been able to offer evidence explaining the discrepancies.

We note first that the propounders did not make a timely objection to evidence of the contract, and only objected after it had been fully discussed by the witness on cross-examination. Therefore, the objection was not timely and the trial judge was not required to sustain the objection even if it was meritorious. 1 Brandis on N.C. Evidence, § 27, p. 101 (1982). Consequently, there was no error in allowing testimony relating to the contract or in allowing the contract itself into evidence.

Finally, as to both the testimony of James Durham and the contract, the evidence indicates that both the 1977 will and the contract were prepared by the same law firm, of which the executor of the 1977 will and his counsel in this proceeding were members, and a deceased member of the firm had been the testatrix' attorney for decades. It would seem reasonable to assume (1) that the files of that law firm would contain sufficient materials to enable the propounders to meet the caveators' "surprise" evidence, and (2) that this evidence could have been

located during the reasonable time offered by the trial court to the propounders to meet the caveators' evidence. Under these circumstances, the court correctly admitted this evidence and did not abuse its discretion by denying propounders' motion for a continuance and motion for a new trial on the grounds of unfair surprise.

II

The propounders' principal contention is that the trial court erred by denying their motion to set aside the verdict and grant a new trial on the grounds that the jury's verdict was contrary to the law relating to the testamentary capacity of one under guardianship and against the greater weight of the evidence.

[3] As to the former ground, it is well established that when the presiding judge grants or refuses to grant a motion to set aside the verdict because of some question of law or legal inference which the judge decides, the decision may be appealed and the appellate court will review it. *McNeill v. McDougald*, 242 N.C. 255, 87 S.E. 2d 502 (1955); *Akin v. Bank*, 227 N.C. 453, 42 S.E. 2d 518 (1947); *In re Will of Herring*, 19 N.C. App. 357, 198 S.E. 2d 737 (1973); *see generally* 12 Strong's N.C. Index 3d, Trial, § 48, p. 471. By contrast, where no question of law or legal inference is involved, a motion to set aside the verdict is addressed to the sound discretion of the trial court and its ruling is not subject to review in the absence of an abuse of discretion. *Pruitt v. Ray*, 230 N.C. 322, 52 S.E. 2d 876 (1949); *Goodman v. Goodman*, 201 N.C. 808, 161 S.E. 686 (1931); *In re Will of Herring, supra; Glen Forest Corp. v. Bensch*, 9 N.C. App. 587, 176 S.E. 2d 851 (1970). A motion to set aside the verdict as being contrary to the weight of the credible evidence is addressed to the sound discretion of the presiding judge and therefore his decision will not be disturbed on appeal in the absence of a showing of abuse. *Britt v. Allen*, 291 N.C. 630, 231 S.E. 2d 607 (1977); *In re Brown*, 23 N.C. App. 109, 208 S.E. 2d 282 (1974). We note here that both the propounders and the caveators presented substantial, credible testimony as to the testamentary capacity of Edna Maynard on 13 November 1979, the date on which the 1979 will was executed. The evidence before the jury on this issue was squarely in conflict. The jury specifically found that Edna Maynard had sufficient mental capacity to make and execute a valid last will and testament on

13 November 1979. The propounders do not argue in their brief that the court abused its discretion, and the record with regard to this issue discloses no abuse of discretion. Therefore, the trial court's denial of the motion on the ground that the verdict was against the greater weight of the evidence will not be disturbed on appeal.

[4] The legal issue presented by the propounders' contention that the verdict was contrary to law is whether the prior adjudication of the testatrix' incompetency from want of understanding to manage her affairs raised a conclusive presumption of mental incompetency so as to deprive the subsequently executed will of testamentary effect.

The propounders argue that the mental capacity required to make and execute a valid will is no different from the mental capacity required for a person to execute a contract or manage his affairs. Further, that the decision in *Sutton v. Sutton*, 222 N.C. 274, 22 S.E. 2d 553 (1942) established that insofar as parties and privies to the guardianship proceedings are concerned, the adjudication of incompetency sets up a *conclusive* presumption of mental incompetency at a subsequent date. The caveators on the other hand, argue that testamentary capacity differs from the mental capacity to manage one's affairs, and, therefore, a person who has been declared incompetent may subsequently have the testamentary capacity to execute a will. They argue that *Sutton* itself recognizes the difference between the two capacities and establishes only a *rebuttable* presumption that one under guardianship lacks testamentary capacity. We agree.

The issue here is whether the testatrix had sufficient testamentary capacity on 13 November 1979, the date of execution of her subsequent will, which expressly revokes the 1977 will. Generally, the same mental capacity necessary to make a will is required to revoke one. *Sutton v. Sutton, supra.* A person has sufficient testamentary capacity within the meaning of the law if he (1) comprehends the natural objects of his bounty; (2) understands the kind, nature, and extent of his property; (3) knows the manner in which he desires his act to take effect; and (4) realizes the effect his act will have upon his estate. *In re Womack*, 53 N.C. App. 221, 280 S.E. 2d 494, *disc. rev. denied*, 304 N.C. 391, 285 S.E. 2d 837 (1981); *see generally* 13 Strong's N.C. Index 3d, Wills § 22;

Wiggins, Wills and Administration of Estates in North Carolina, § 43 (2d Ed. 1983). The law presumes that a testator possessed testamentary capacity, and those who allege otherwise have the burden of proving by the preponderance or greater weight of the evidence that he lacked such capacity. *In re York*, 231 N.C. 70, 55 S.E. 2d 791 (1949).

The effect of an adjudication of incompetency on the issue of testamentary capacity at a later date was stated by the *Sutton* court as follows:

> Where a person has been adjudged incompetent from want of understanding to manage his affairs, by reason of physical and mental weakness on account of old age, disease or like infirmities, and the court has appointed a guardian, and not a trustee, the ward is conclusively presumed to lack mental capacity to manage his affairs, insofar as parties and privies to the guardianship proceedings are concerned; and, while not conclusive as to others, it is presumptive proof of the mental incapacity of the ward, and this presumption continues unless rebutted in a proper proceeding. *Johnson v. Insurance Company*, 217 N.C. 139, 7 S.E. 2d 475; *Parker v. Davis*, 53 N.C. 460; *Ripply v. Gant*, 39 N.C. 443; *Christmas v. Mitchell*, 38 N.C. 535; *Armstrong & Arrington v. Short*, 8 N.C. 11. *Therefore, in any event, in the absence of proof to the contrary, a person for whom a guardian has been appointed pursuant to the provisions of Consolidated Statutes of North Carolina, Vol. 3, Sec. 2285, as amended by Public Law 1929, Chap. 203, is presumed to lack the mental capacity to make or revoke a will.* (Emphasis added.)

222 N.C. at 277, 22 S.E. 2d at 555. In other words, where a person has been declared incompetent to *manage his affairs*, and a guardian appointed, the person is presumed to lack mental capacity to *manage his affairs*, and this presumption is conclusive as to parties and privies to the guardianship proceedings and rebuttable as to all others. As to *testamentary capacity*, a person for whom a guardian has been appointed is presumed "*in the absence of proof to the contrary*" to lack *testamentary capacity*. The presumption as to *testamentary incapacity* is necessarily a rebuttable one, or there could be no "proof to the contrary." Therefore, the propounders' reliance upon *Sutton* to establish a conclusive presump-

tion as to Edna Maynard's testamentary incapacity in November, 1979 is untenable.

Furthermore, the rule as stated in *Sutton* is in accord with the general rule that one under guardianship for want of understanding to manage his own affairs may subsequently make a valid will.

As a general rule, an adjudication that a person is insane or a lunatic is competent evidence, if properly authenticated, on the issue of his testamentary capacity as of a subsequent time. Proof of the appointment of a guardian or conservator for a person, as incompetent to manage his own affairs, has been held admissible in evidence on the question of his testamentary capacity at a subsequent time, notwithstanding that the appointment was on account of the impairment of mental faculties resulting from old age and did not involve a declaration of insanity.

79 Am. Jur. 2d, Wills, § 125, p. 366 (1975); Anno., 89 A.L.R. 2d 1120 (1963) (mere existence of a guardianship at the time the will was executed does not require the conclusion that the will is invalid); *see also* 79 Am. Jur. 2d, Wills, § 153, p. 386; Note, Effect of Competency Adjudication in Subsequent Will Contest, 2 Syracuse L. Rev. 329 (1951) (adjudication of incompetency does not of itself establish lack of testamentary capacity; it is only prima facie evidence of incapacity).

Implicit in the rule that a person under guardianship may make a valid will is the recognition that although a person is not capable of transacting business in general, he may be capable of understanding the business of making a will and the elements of it. The competency or incompetency of a testator to engage in or understand any complicated matter or transaction in business is not a proper test of his mental capacity to execute a will, and is higher than the law requires. 79 Am. Jur. 2d, Wills, § 75, p. 332. *See also Wiggins, supra*, § 43, p. 61 (author urges that North Carolina rule that the same mental capacity be required for making a contract or deed and a will be abandoned in favor of a rule that the testator or maker must possess the capacity to execute the particular instrument in question).

In North Carolina, neither an adjudication of incompetency, nor the appointment of a guardian is conclusive on the question of

testamentary capacity. *Wiggins, supra,* § 46. Under *Sutton,* the appointment of a guardian raises a presumption against testamentary capacity, shifting the burden of proof to the will's propounders (caveators in the case *sub judice*) to show that the disqualification had been removed at the time of the will's execution. This is consistent with the rule in those cases where "habitual" or "general" insanity has been determined, even where no subsequent sanity hearing has been held prior to the making of the will. In *In re Credle's Will,* 176 N.C. 84, 85-86, 97 S.E. 151 (1918), the Supreme Court held that prior insanity creates a presumption only, and that a will executed subsequently can be valid.

> The rule that, when insanity is proved to have existed at any particular time, it is to be presumed to continue, applies only to cases of general or habitual insanity. Therefore, where a general mental derangement or lunacy is shown to have existed not very long prior to the execution of a will, the burden of proof as to the sanity of the testator is thrown upon the propounder to show that when the will was executed the testator was of sound mind.

*See also In re Thorp,* 150 N.C. 487, 64 S.E. 379 (1909). Similarly, the insane person during a lucid interval can make a valid will. *Wiggins, supra,* § 46.

The reason for holding the presumption of continuing mental insanity or incompetency to be a rebuttable one in a subsequent independent proceeding was explained by the Supreme Court in *Johnson v. Insurance Co.,* 217 N.C. 139, 142-143, 7 S.E. 2d 475, 476-477 (1940).

> The mental capacity of the plaintiff was a fact, capable of proof as any other fact, regardless of the finding of the jury in the lunacy proceeding or the order of court following upon it. *Certainly if a person is adjudged sane in a lunacy proceeding, he is no more conclusively so than he might be under natural conditions before the law became concerned with the inquiry, and an adjudication of such a court, when presented in a matter not connected with the immediate purpose and scope of the proceeding, when admissible at all, is no more than evidence* . . . It may serve as evidence of the condition it purports to find, but such presumptions as arise from it are rebuttable . . . (Emphasis added.)

*See also Medical College v. Maynard*, 236 N.C. 506, 73 S.E. 2d 315 (1952).

In the case under discussion, the propounders of the 1977 will introduced evidence that on 21 February 1979 Edna Earl Maynard was adjudged incompetent for want of understanding to manage her affairs by reason of mental and physical weakness on account of hardening of the arteries, congestive heart failure, emphysema, and high blood pressure and a mental condition connected therewith. Pursuant to G.S. 35-2, a guardian was appointed and the guardianship was active until the time of the testatrix' death. At no time thereafter was a proceeding to restore Mrs. Maynard's competency instituted, although it was considered. Approximately nine months later, Mrs. Maynard executed a will dated 13 November 1979. All of the parties to the will caveat were parties to the guardianship proceedings.

In *Sutton v. Sutton, supra*, the testator had been declared mentally incompetent to handle his affairs and one of the plaintiffs (children of the testator from a previous marriage) was appointed general guardian and continued to act as such until the testator's death. The defendant in *Sutton* was the testator's second wife. Plaintiffs filed a complaint alleging the foregoing facts and alleging fraud in connection with defendant's subsequent prevention of the testator's revocation of his will. The Supreme Court held that the complaint should have been dismissed for failure to state a claim entitling plaintiffs to relief, apparently because the complaint contained no allegations as to the testator's having regained his competency at the time of the attempted revocation, or of his otherwise possessing sufficient testamentary capacity to make a valid revocation. In other words, the complaint disclosed on its face the existence of facts giving rise to a presumption of testamentary incapacity, but contained no factual allegations which would rebut that presumption.

In the present case, in addition to evidence of the testatrix' prior adjudication of incompetency and active guardianship, the propounders introduced testimonial evidence regarding her lack of testamentary capacity from Johnson Howard, Mrs. Maynard's first guardian, Dr. Boyles, her doctor from 1976 to 1979, and various other health care professionals who attended Mrs. Maynard in 1979. The testimony of all of the foregoing witnesses

was to the effect that in their opinion, on 13 November 1979, Mrs. Maynard did not have sufficient mental capacity to make a will in that she tended to get her children's names confused and did not know the natural objects of her bounty, that she was easily swayed by her children, that she did not know the nature and extent of her property or the legal consequences of making a will.

The caveators, on the other hand, presented testimonial evidence to the effect that on 13 November 1979, Mrs. Maynard had testamentary capacity by the testimony of Larkin Kirkman, Mrs. Maynard's second guardian, Attorney Carl Holleman, who drafted the 1979 will, Attorney Paul Stam, Holleman's law partner and Susan Williams, their legal secretary, both of whom were attesting witnesses to the 1979 will, and Dr. Eddie Stiles, who saw the testatrix in December, 1979 and January, 1980. Holleman, Stam, Kirkman and Williams all testified that, in their opinions, on the date in question, Mrs. Maynard had sufficient mental capacity to execute a valid will, that she knew the natural objects of her bounty, that she knew who her children were and knew the nature and extent of her property and the legal consequences of making a will. Holleman, Stam and Williams testified that the testatrix indicated that she provided in her later will for only three of her children (Raymond, Ruby and Mildred) because the other two (Troy and Edna) had already received their share. Dr. Stiles testified that he saw the testatrix on 13 December 1979, 7 January 1980, and on 6 January 1980; that on the latter date he performed a mental status evaluation of the testatrix; that he concluded that she was competent to handle her affairs and so advised the guardian, Larkin Kirkman. Attorney Brian Howell saw the testatrix and also spoke with her by telephone in October, 1979 and he was also of the opinion that the testatrix had testamentary capacity at these times. Thus, whether this testimony was sufficient to rebut the presumption of incapacity was a question for the jury to determine.

Initially, the trial court instructed the jury as follows on the effect of the incompetency adjudication on the issue of the testatrix' testamentary capacity:

Members of the Jury, ordinarily the law is that there is a presumption that the testatrix possessed sufficient mental capacity to execute a valid will in the absence of evidence to

the contrary. However, the Court instructs you in this case where the testatrix had previously been declared incompetent by want of understanding to manage her own affairs on February the 21st, 1979, the Court instructs you that the law presumes in the absence of any proceeding to restore her competency the law presumes that that same condition existed on November the 13th, 1979.

This presumption, however, is not conclusive and may be rebutted by the caveators. The burden of proof, therefore, is upon the caveators to prove by the greater weight of the evidence that at the time of the execution of the paper writing on November 13, 1979, that the testatrix, Edna Earl Maynard did have sufficient mental capacity to make and execute a valid last will and testament.

The court later reinstructed the jury as follows:

I instruct you that the burden of proof on that issue was on the caveators to prove by the greater weight of the evidence that on November 13, 1979, at the time of the signing and executing the paper writing that Edna Earl Maynard did have sufficient mental capacity to make and execute a valid last will and testament.

I instruct you that ordinarily there is a presumption in the law that a testatrix possessed sufficient mental capacity to execute a valid will in the absence of evidence to the contrary but in this case I instruct you that the testatrix having been declared mentally incompetent by want of understanding to manage her own affairs on February the 21st, 1979, and no proceeding having been instituted to restore her competency, I instruct you that the law presumes that that condition of mind continued on up until November the 13th, 1979, and I further instruct you that where one has been declared incompetent by want of understanding to manage her own affairs, then there is a presumption that that person would lack the sufficient mental capacity to make and execute a valid last will and testament but that that presumption was not conclusive; that that presumption merely shifted the burden of proof to the caveators to prove that she did have sufficient mental capacity to execute a valid last will and testament on November the 13th, 1979, and to prove that by the greater

weight of the evidence. Whereas, if there had not been any incompetency proceeding, that burden of proof would have been upon the propounders to prove that she did not have sufficient mental capacity to execute a valid last will and testament.

Thus, you must decide whether Edna Earl Maynard had the testamentary capacity to make a will.

It is elemental that the credibility of each witness who testified and the weight to be given any evidence are issues of fact for the jury to decide. The caveators presented substantial evidence of the testatrix' mental capacity to execute a valid will on 13 November 1979, which, if believed, was sufficient to rebut the presumption of incapacity arising from the adjudication of incompetency and support a verdict in favor of the caveators on the issue of the testatrix' testamentary capacity. Therefore, the jury's verdict was not contrary to law and the trial judge did not err in denying the propounders' motion to set aside the verdict on that basis.

The propounders also argue that the verdict finding the 1979 will to be valid was contrary to law and against the greater weight of the evidence because the evidence at trial showed that, with regard to her son Troy, the testatrix was laboring under an insane delusion which deprived her of testamentary capacity. We note here that the issue of mental incapacity due to insane delusion or "monomania" was not submitted to the jury. The record discloses no request that the jury be instructed on the law regarding insane delusions as it relates to the facts of this case, nor was any objection to the instructions entered on the basis of that omission.

North Carolina requires that the testatrix must be of "sound mind." G.S. 31-1; see In re Will of Pridgen, 249 N.C. 509, 107 S.E. 2d 160 (1959). Generally, partial insanity will invalidate a will which is the direct offspring thereof, and a will which is the product of an insane delusion is also invalid for want of testamentary capacity. 79 Am. Jur. 2d, Wills, § 87, p. 339; Anno., 175 A.L.R. 882 (1948).

If a person has sufficient mental ability to make a will but is subject to an insane delusion, i.e., monomania, as to one of

the essential requirements of testamentary capacity, the will would not be valid. For example, if the testator has an insane delusion as to the objects of his bounty, it would invalidate his will.

\* \* \*

An insane delusion must be distinguished from prejudice, hate, bad judgment, ill will, and any number of other conditions which might be associated with sanity. To be sufficient to invalidate the will, the delusion must have no foundation in fact and must be the product of the testator's diseased or deranged mind.

*Wiggins, supra,* § 47, p. 65-66. However, to justify the setting aside of a will on the ground that the testatrix was possessed of an insane delusion, it must also be shown that the insane delusion was *actually operative* in the production of the will. 79 Am. Jur. 2d, Wills, § 88, p. 341.

Both of the attorneys who served as guardian to Mrs. Maynard testified that at times Mrs. Maynard expressed a fear that Troy was going to harm or try to kill her. Larkin Kirkman characterized this belief as an "irrational fixation," and both guardians testified that, in their respective opinions, Mrs. Maynard's fear of Troy was unfounded. However, Kirkman also characterized Mrs. Maynard's attitude towards Troy as one of "anger," and Johnson Howard testified that Mrs. Maynard's attitude towards Troy was not fixed, but changeable. Apart from the opinion of the two guardians, the record is devoid of evidence that Troy had, or that he had not, actually threatened his mother or attempted to harm her. Therefore, the evidence produced on Mrs. Maynard's beliefs about her son is simply insufficient to justify a conclusion, as a matter of law, that her belief was an "insane delusion," that is, the product of a *diseased* or *deranged* mind and that it had no foundation in fact. On the evidence produced at trial, Mrs. Maynard's expressions concerning Troy are indistinguishable from expressions of simple misjudgment, ill will or extreme anger, conditions which are equally consistent with sanity. Nor does the evidence demonstrate that Mrs. Maynard's belief about Troy was actually operative in the production of the 1979 will. Although there was evidence that relations between Mrs. Maynard and her children Troy and Edna Grubbs were somewhat strained in the

year preceding her death, there was also substantial evidence presented that the 1979 will omitting these two children was executed because the testatrix felt that Troy and Edna had already received their portion of her estate, and that the fair thing to do would be to leave the balance of her estate to her other three children, Mildred, Ruby and Raymond. Furthermore, we note that there is no contention that the testatrix had an insane delusion as to her daughter Edna, and Edna was also omitted from the 1979 will. Edna's omission, according to the attesting witnesses, was for the same reason that Troy was omitted.

Consequently, the record in the case does not support the propounders' contention that the jury's verdict finding the testatrix to have possessed sufficient mental capacity to execute a valid will is contrary to law. Nor have the propounders demonstrated that the trial court abused its discretion in ruling on the motion to set aside the verdict as contrary to the greater weight of the evidence. Therefore, the ruling will not be disturbed on appeal. *Britt v. Allen, supra; In re Brown, supra.* In sum, there is no merit to the propounders' contention that a new trial should be granted because of a claimed "insane delusion" of the testatrix.

## III

[5] By their assignments of error 7, 8, and 9 propounders argue that the trial court erred in its instructions to the jury on the issues of testamentary capacity and undue influence in relation to the execution of the will. However, no objection to any portion of the jury charge or omission therefrom was entered before the jury retired to consider its verdict. Rule 10(b)(2) of the Rules of Appellate Procedure provides:

> No party may assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

Therefore, pursuant to Rule 10(b)(2), the propounders waived their right to assert an assignment of error based on the jury instruc-

tions. However, by their memorandum of supplemental authority, propounders argue that the "plain error" rule, recently adopted by the Supreme Court in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983), is applicable to the errors assigned in this case.

The plain error rule allows for appellate review of errors normally barred by waiver rules such as Rule 10(b)(2). The propounders' argument that the plain error rule applies to the jury instructions on testamentary capacity and undue influence raises the issue of whether the rule is applicable to civil actions. In *State v. Odom*, the Supreme Court expressly adopted the "plain error" rule that is used by the federal courts pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure. The federal Rule 30 is virtually identical to North Carolina's Rule 10(b)(2), and it would ordinarily require that all errors in jury instructions be brought to the attention of the trial court in order to preserve the question for review. However, Rule 52(b) states that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The plain error rule followed by several of the federal courts, and specifically adopted in *Odom*, has been defined as follows:

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) (footnotes omitted) (emphasis in original).

307 N.C. at 660, 300 S.E. 2d at 378. Our research discloses no decision of the Supreme Court subsequent to *Odom* in which the plain error rule has been applied in a civil action.

We note that federal appellate review of "plain errors or de-fects affecting substantial rights" is specifically authorized by the Federal Rules of Criminal Procedure. The North Carolina Rules of Appellate Procedure contain no exact counterpart to the federal Rule 52(b), although Rule 2 does allow suspension of the re-quirements of the rules "to prevent manifest injustice to a party." However, in *Odom*, the Court emphasized that indiscriminate use of the plain error rule would undermine the purpose of Rule 10(b)(2), which is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case, and thereby eliminate the need for a new trial. It is clearly for these reasons that the federal courts apply the rule *cautiously* and only in the *exceptional* case and have defined the instances in which the plain error rule is applicable with such restrictive terms.

In *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A. 2d 114 (1974), a civil negligence action, the issue before the Supreme Court of Pennsylvania was whether the appellate court must consider errors in jury instructions claimed to be "basic and fundamental" despite the absence of any objection or specific ex-ception at trial. Justice Roberts (now Chief Justice), writing for the majority, reasoned that the basic and fundamental error doc-trine suffers from two major weaknesses: (1) "[a]ppellate court consideration of issues not raised in the trial court results in the trial becoming merely a dress rehearsal," and (2) "[t]he theory has been formulated in terms of what a particular majority of an ap-pellate court considers basic or fundamental." 322 A. 2d at 116, 117. The majority noted further that the ad hoc nature of the rule rendered it unworkable and that to date it had not been judicially developed into a predictable, neutrally applied standard. In view of these practical problems, the majority declared that basic and fundamental error would no longer be recognized as a ground for consideration on appeal of allegedly erroneous jury instructions; a specific exception must be taken. Justice Pomeroy concurred in the result, but dissented from the complete exclusion of the doc-trine of basic and fundamental error, reasoning that the doctrine has long been established in Pennsylvania and other jurisdictions, and has a useful role to play in protecting the fundamental con-stitutional rights of litigants to a fair and impartial trial.

> This right is an integral part of due process of law, guaranteed to all litigants by the Fifth and Fourteenth Amendments. Obviously it is only an unusual trial error that will amount to a denial of due process, and in my view, the doctrine should be available to remedy only those trial errors so contrary to fundamental fairness as to reach the dimensions of a constitutional violation.

322 A. 2d at 118 (Pomeroy, J., dissenting). Although the result reached in *Dilliplaine* is contrary to *State v. Odom*, the majority's concerns regarding the practical problems attendant to appellate review of "basic" or "plain" errors must be taken into account when considering the rule's applicability to a particular case. We find no express indication in either *Odom* itself, or in *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983) ("plain error" rule applicable to Rule 10(b)(1) waiver), that our Supreme Court intended to restrict the doctrine exclusively to criminal appeals, despite the rule's derivation from the Federal Rules of Criminal Procedure. Therefore, assuming that "plain error" applies to civil actions, we are persuaded by the reasoning of the dissenting opinion in *Dilliplaine*, that the doctrine of plain error should be available to remedy only those unusual trial errors so contrary to fundamental fairness as to amount to a denial of the litigant's due process right to a fair and impartial trial. This test is roughly analogous to the definition of plain error in criminal appeals stated by the federal courts pursuant to Rule 52(b), and adopted by the Supreme Court in *State v. Odom* and *State v. Black*.

Therefore, assuming "plain error" is applicable to this civil appeal, we are unable to conclude, after reviewing the entire record, that the alleged errors regarding the instructions on testamentary capacity and undue influence reach the dimensions of an unconstitutional deprivation of the propounders' right to a fair and impartial trial, or that the error is a "fundamental error, something so basic, so prejudicial, so lacking in its element that justice cannot have been done," in the words of *State v. Odom, supra.*

We have discussed the substance of the propounders' contentions regarding the effect of a prior adjudication of incompetency on the issue of testamentary capacity, and set forth the trial

court's instruction and reinstruction on that issue in Part II of this opinion. Although the court misstated the law in the initial instruction, the error was not prejudicial to the propounders as it placed a greater burden on the caveators than the law requires, the caveators having only the burden of showing testamentary capacity, not capacity to manage business affairs. Furthermore, the trial court reinstructed the jury on this point after deliberations began, and this time the instructions were a substantially correct statement of the law, thus curing any prior error.

Propounders present a two-part argument regarding the trial court's instruction on undue influence: (1) that the court, by reading, virtually verbatim, the North Carolina Pattern Jury Instructions, adding only a short statement relating the law to the evidence adduced, did not adequately apply the law to the specific facts pertinent to the issue, in violation of G.S. 1A-1, Rule 51,[1] and (2) that the court failed to instruct the jury that where all the indicia of undue influence are present in the making and execution of a will, there arises a presumption of undue influence, and the burden is cast upon the propounders of that will to rebut this presumption.

In general, the propounders of the 1977 will sought to demonstrate that the making and execution of the 1979 will was procured by the undue influence of caveator Ruby Maynard. The trial court fairly and accurately summarized the contentions and the evidence of both the propounders and the caveators. The court's detailed summary covered 18 pages of the trial transcript. Following this summary, the court fully explained the law on testamentary capacity and the law on undue influence. The instructions given the jury declared and explained the law arising on the evidence given in the case. The court's charge, "considered contextually, was in substantial compliance with the statute." *In re Will of Goodson*, 4 N.C. App. 257, 261, 166 S.E. 2d 447, 450 (1969). The propounders' contention that the court violated G.S. 1A-1, Rule 51 is without merit.

With respect to the substance of the court's instruction on the law of undue influence, the propounders' contention that the

---

1. Propounders also argue this point with respect to the instruction on testamentary capacity.

---

**In re Will of Maynard**

---

evidence raised a *presumption* that the 1979 will was procured by undue influence, to be rebutted by the caveators (propounders of the 1979 will) is also without merit. Whether the testatrix' 1979 will was the product of undue influence is a question of fact for the jury to determine. The general rule is that in a caveat proceeding, the burden of proof is upon the propounders (caveators in this case) to prove that the instrument in question was executed with the proper formalities required by law. Once this has been established, the burden shifts to the caveator (propounders in this case) to show by the greater weight of the evidence that the execution of the will was procured by undue influence. *In re Andrews*, 299 N.C. 52, 261 S.E. 2d 198 (1980). We have carefully examined the instruction on the law of undue influence and find that it adequately and correctly states the factors to be considered by the jury in making its determination in accordance with the elements of undue influence set forth in *In re Andrews, supra*. In sum, to the extent that the trial court erred in its jury instructions, such errors did not amount to a denial of the propounders' due process right to a fair and impartial trial, and, therefore, did not constitute "plain errors" which would mandate a new trial.

We have carefully examined the propounders' remaining assignments of error and find that they are without merit. We conclude that the propounders had a fair trial, free from plain and prejudicial error.

No error.

Judges WELLS and WHICHARD concur.