380 P.2d 601

In the Matter of the ESTATE of Mary Emma STITT, Deceased.

No. 7030.

Supreme Court of Arizona,

En Banc.

April 11, 1963.

Rehearing Denied May 7, 1963.

Stephen B. Rayburn, Patrick O'Reilly, Minne & Sorenson, Marshall W. Haislip, Phoenix, for appellants.

Cordova, Goss & Mariscal, Jennings, Strouss, Salmon & Trask, Phoenix, for appellees.

BERNSTEIN, Chief Justice.

Proponents of the will of Mary Stitt were granted judgment notwithstanding the verdict by the trial court. Contestants appeal.

■ The sole issue raised on this appeal is the propriety of the trial court's action in rendering judgment contrary to the jury's verdict. In this court, we must view the evidence in the light most favorable to the contestants, against whom judgment was rendered, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether, under the law, the verdict for them can be sustained. Spain v. Kelland, 93 Ariz. 172, 379 P.2d 149 (1963).[1]

The evidence, in general, is without conflict. Mrs. Stitt was about 65 years of age at the time of her death on October 28, 1958. She entered the hospital on September 28, 1958, and executed her will on the evening of the 29th. Immediately after the signing of the will she underwent an operation from which she never recovered.

The testatrix had lived in south Phoenix for thirty-two years. After her husband's death in 1945 she remained in their home by herself until 1953. In that year she requested her older brother to join her and help take care of the house and her chickens, which he did. Some months later she took a decided dislike to him and ordered him to move to the basement. He stayed there for awhile but eventually moved outside and lived on the property in an old converted bus. During all this time he contributed his pension to the maintenance of the household, sold his own property to help pay their expenses, and worked around the house and yard.

Contestants produced a number of witnesses who had known Mrs. Stitt over a period of years. Most of them were her neighbors and her tenants who rented dwellings on two lots she owned in the vicinity of her home. They testified that from 1955 until her death there was a marked change in her appearance, conduct, and attitudes. Before 1955 she was ap-

1. The evidence is viewed in the same light on a directed verdict or a verdict n. o. v. 5 Moore's Fed.Prac. § 50.02, p. 2316.

parently a quiet, mannerly, modest woman. But during the last three years of her life she became coarse and profane. The testimony is to the effect that she shrieked and screamed at all hours of the day and night. That she mistreated her brother and cursed him, although he diligently performed his tasks around the house. That she became utterly careless in her dress, took to wearing very little clothing, rarely combed her hair or bathed, and on occasion was indecently exposed in the presence of neighborhood children. She stopped taking care of her house, stopped cooking, and ate from cans, although she fed her animals and chickens better food. She affirmed a belief in the "power of thought" and practiced "black magic." She thought she could cast spells on people and tried to put a hex on the family next door so they would move out. She sat in the outhouse behind her home and watched the neighbors' children from a peephole or stalked up and down along the fence between their property, glaring and gesturing to them and sticking out her tongue, in her efforts to get them to leave. She declared that the members of a church on the corner were praying for her to die so that they could acquire her property, when in fact, according to the minister, they wanted to move to another part of town. She was suspicious of people and built a fence around her house to "keep my enemies out" and hung a padlock on the gate. In the last months before her death her conversation became incoherent and her mind wandered, she was forgetful and childish, and she seemed even more quarrelsome and ill-tempered than before.

It is urged that Mrs. Stitt's will is further evidence of her incompetency. Mrs. Stitt had no close friends, although acquaintances from earlier years testified that they still saw her occasionally in the last years of her life. Their testimony shows that Mrs. Stitt spoke frequently of her deceased husband, of whom she was very fond. She left most of her property to his relatives. She spoke, too, of her nieces, Elva and Gyla, although they are not remembered in the will. She did not attend church, but was interested in discussing religion. She had received her education in Roman Catholic schools, but in later life was interested in Christian Science and also the Mormon faith. One witness, an old friend of Mrs. Stitt, said that she drove Mrs. Stitt to the hospital in September of 1958 and that on the way Mrs. Stitt mentioned that she didn't want to leave the Mormon Church anything and that she was going back to the Catholic Church. However, the Mormon Church is the only one mentioned in her will.

The will provided that her brother was to have her household furnishings, her chickens, and Three Hundred ($300.00) Dollars; her husband's sister was to have her home; the sister's husband was to have an undivided one-half interest in 10 acres of

a 40-acre tract owned by Mrs. Stitt in Deer Valley; a cousin was to have Five Thousand ($5,000.00) Dollars; the two lots in south Phoenix near her home went to another relative of her husband; a one-half interest in 20 acres of the Deer Valley property went to her doctor (he had previously removed an ovarian tumor for her); and one-tenth of the appraised value of the 30 acres so devised was to be paid to the Mormon Church. The remaining 10 acres was to be sold to pay debts and expenses, and the residue of her estate was left to the American Cancer Society.

Proponents argue the evidence merely indicates that the testatrix was a cranky, eccentric old woman. They produced as witnesses, the lawyer who drafted Mrs. Stitt's will, the two attesting witnesses, and the nurses who attended her in the hospital. All of these people testified that they thought Mrs. Stitt was of sound mind *at the time she executed the will*. Proponents argue further that peculiar though she may have been, if there was one thing about which she was not confused, it was her property. All of her disputes with the neighbors seemed to stem from a fear that they wanted her property or were encroaching on it.

■ This court has recognized two types of insanity which will vitiate a will. These are (1) insanity of such a broad character as to establish mental incompetence generally,[2] and (2) mental delusion which can be shown to have directly affected the dispository provisions of the will at the time of its making. Estate of Greene, 40 Ariz. 274, 11 P.2d 947 (1932).

> "The rule is that even though a testator does suffer from delusions or hallucinations, unless the will itself was a creature or a product of such delusions or hallucinations it is not invalid." Estate of Greene, supra, 40 Ariz. 274, 280, 11 P.2d 947, 949.

While in the instant case the contestants have put on much testimony of what they might consider delusions or hallucinations they have not put on any testimony that the will was a creature or a product of these supposed delusions or hallucinations.

■ Contestants contend, however, that on all of the evidence, the jury was justified in finding that the testatrix was mentally incompetent when she executed her will and thus incapable of making a valid testamentary disposition. We have emphasized that the law is concerned only with one's state of mind *at the time of the*

2. Even where general insanity is shown, it must have affected the will. "It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld." In re Perkins' Estate, 195 Cal. 699, 235 P. 45 (1925) (quoted with approval in Estate of Greene, 40 Ariz. 274, 11 P.2d 947 (1932)).

*execution of the will.* Estate of Greene, supra.

> "Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncracies, moral or mental irregularities or departures from the normal *unless they directly bear upon and have influenced the testamentary act.*" In re Wright's Estate, 7 Cal.2d 348, 60 P.2d 434, 438.[3]

The evidence before us leaves little doubt that Mrs. Stitt had a volatile disposition and that she had unconventional and disgusting personal habits. But it does not show that at the time she executed her will she failed to understand the nature of her act, the nature and extent of her property, or the objects of her bounty. On the contrary, there was uncontradicted testimony from disinterested witnesses that on the evening of September 29, 1958, during the time she was dictating her will and when it was read back to her, as well as when she signed it, she seemed "normal in all respects."

■ We agree with the trial judge that the evidence in this case was insufficient as a matter of law to establish testamentary incapacity at the time the will was executed.

In view of our decision we find it unnecessary to discuss the other point raised in appellants' brief. The judgment of the lower court is affirmed.

UDALL, V. C. J., and STRUCKMEYER, JENNINGS, and LOCKWOOD, JJ., concurring.

---

3. In the case cited, decedent's will was upheld in the face of evidence that he had suffered a head injury which seemed to change him, gave a witness a fish soaked in kerosene saying it was fresh, scavenged in garbage cans and hid the trash around the house, went outdoors wrapped only in a blanket, and adorned his rose bushes with artificial flowers.