732 P.2d 571

**In the Matter of the ESTATE OF Winifred L. THORPE, Deceased.**

**Lucretia THORPE, Personal Representative of the Estate of Winifred L. Thorpe, Proponent-Appellant,**

v.

**Wilbur THORPE, Contestant-Appellee.**

**No. 1 CA–CIV 8569.**

Court of Appeals of Arizona,
Division 1, Department C.

Aug. 14, 1986.
Reconsideration Denied Oct. 17, 1986.
Review Denied Feb. 13, 1987.

Favour, Weaver, Moore & Schuyler, P.A. by John M. Favour, Janis Ann Sterling, Prescott, for proponent-appellant.

David A. Chamberlain, P.C. by David A. Chamberlain, Prescott, for contestant-appellee.

## OPINION

PAUL G. ULRICH, Judge Pro Tem.

This appeal involves a will contest in which one of decedent's sons successfully challenged the validity of his mother's will. The primary issue is whether there was sufficient evidence to support a finding that decedent lacked testamentary capacity to execute the will. Appellant has requested attorney's fees for defending her claim at trial and on appeal. Appellee has requested attorney's fees on appeal. We reverse and deny both requests for attorney's fees.

On July 25, 1983 a will signed by Winifred Thorpe dated February 25, 1981 was admitted to informal probate. Lucretia Thorpe was appointed personal representative of the estate. Lucretia was the former wife of Thomas Thorpe, Winifred's elder son. She was also the primary beneficiary of the will.

Wilbur Thorpe, Winifred's younger son, filed a petition to set aside informal probate and objections to probate of the will. Lucretia then filed a petition for formal probate of the will. Wilbur filed an opposition to formal probate on several grounds. Ultimately, Wilbur sought to invalidate the will on the sole ground his mother lacked testamentary capacity.

The issue of Winifred Thorpe's testamentary capacity was tried to an advisory jury. It returned a special verdict, finding Winifred did not have testamentary capacity at the time she signed her will. Lucretia's motions for judgment notwithstanding the verdict and for new trial were denied and judgment was granted invalidating the will and terminating Lucretia's appointment as personal representative of the estate. Lucretia has filed a timely notice of appeal to this court.

## FACTUAL BACKGROUND

On February 21, 1981, Winifred, then 89 years of age, called her friend Cora Brandon. She made arrangements for Cora to drive her to Prescott to meet Attorney John Favour on February 23, 1981 to prepare a new will. While riding to the meeting, Winifred informed Cora she intended to change her will to leave everything to Lucretia and wanted Cora to be present.

Winifred was the last surviving child of Joe Mayer, the founder of Mayer, Arizona. Her home had been the original Mayer

stage stop and post office. Cora testified Winifred said she wanted her Mayer properties left as an historical center and felt Lucretia was the only one who would do what she wanted. Cora also stated Winifred did not want Wilbur to have the property because she was afraid he would sell it or rebuild it with apartments. She was also afraid her son Tom would sell it and use the money for drink.

At her attorney's office, Winifred introduced Cora to John Favour. She then directed Favour to change her will to leave everything to Lucretia and name Lucretia as personal representative. She informed Favour of her reasons for excluding her children from the will. Favour prepared Winifred's will in accordance with her instructions. Winifred could not return to Favour's office to sign her will the following day because she was having a new lock put on her front door. However, she planned to see him again on February 25, 1981.

During the evening of February 24, 1981, Winifred fell and broke her hip. She was locked in her home at the time of the accident, making it difficult for others to come to her aid. Eventually, a deputy sheriff broke down the door to reach Winifred. She was transported by ambulance to the emergency room of Yavapai Community Hospital and was admitted to the hospital for surgery. Cora Brandon stayed with Winifred in the emergency room. Winifred asked her to do several things including calling Attorney Favour with respect to her will.

Attorney Favour's secretary, Dallas Luc, took the will prepared by Favour to the hospital for Winifred's signature on February 25, 1981. Winifred executed her will sometime between 1:00 and 2:00 p.m. that day, prior to her 3:00 p.m. scheduled surgery. Ms. Luc and three witnesses saw Winifred execute the will. The witnesses each signed an affidavit that they had witnessed the signature. Winifred had complications following surgery. She was transferred to the extended-care area of the hospital on March 26, 1981.

Nancy Sterling, a social worker at Yavapai Community Hospital, concluded that Winifred's family structure was pathological and not supportive. She noted particularly the poor relationship between Winifred and Wilbur and concluded Winifred would be unable to return to her home alone. On May 8, 1981 Winifred was discharged from the hospital and admitted to Samaritan Village, a nursing home.

Ms. Sterling contacted Winifred's attorney and asked him to act as Winifred's advocate. Eventually, a conservator was appointed for Winifred. The conservator brought an action against Wilbur and his wife to obtain title to certain real and personal property. A settlement was ultimately reached by which Winifred was given title to the disputed realty and certain personal property in Wilbur's possession was ordered to be delivered to the conservator. Winifred died in Samaritan Village on July 19, 1983.

## TESTAMENTARY CAPACITY

The requisite mental capacity to execute a will is presumed by law. *In re Vermeersch's Estate*, 109 Ariz. 125, 128, 506 P.2d 256, 259 (1973). To invalidate a will for lack of testamentary capacity the burden is on the contestant to show that decedent lacked the ability to know the nature and extent of her property, the ability to know the natural objects of her bounty or the ability to understand the nature of the testamentary act. *Id.* The contestant must produce legally sufficient evidence to rebut the presumption of capacity and show affirmatively and by a preponderance of the evidence that a testator lacks one of the elements of capacity at the time the will is signed. *In re Walters' Estate*, 77 Ariz. 122, 125, 267 P.2d 896, 898 (1954); *In re Smith's Estate*, 53 Ariz. 505, 508, 91 P.2d 254, 255 (1939).

## STANDARD OF REVIEW

This court may properly examine the evidence to determine whether it is legally sufficient. *E.g., In re Walters' Estate, supra.* Moreover, verdicts in will

contests should be closely scrutinized by a reviewing court when the sufficiency of the evidence is called into question. *In re Vermeersch's Estate*, 109 Ariz. at 127, 506 P.2d at 258; *In re Walters' Estate*, 77 Ariz. at 129, 267 P.2d at 901; *In re Accomazzo's Estate*, 16 Ariz.App. 211, 212, 492 P.2d 460, 461 (1972). We are required by these decisions to apply that specialized, "close scrutiny," standard of review in relation to the evidence and expert opinions here involved. It is thus unnecessary to consider whether the evidence might be sufficient to support the superior court's discretion in permitting the expert opinion here involved in cases not involving will contests as a more general matter. *See generally*, M. Udall & J. Livermore, *Law of Evidence* § 25 (2nd ed. 1982).

## EXECUTION OF THE WILL ON FEBRUARY 25, 1981

■ In a will contest, the material point of time for purposes of inquiry into mental capacity is the time of the will's execution. *In re Vermeersch's Estate*, 109 Ariz. at 127–128, 506 P.2d at 258; *In re Stitt's Estate*, 93 Ariz. 302, 305–306, 380 P.2d 601, 603 (1963); *In re Weils' Estate*, 21 Ariz.App. 278, 282, 518 P.2d 995, 999 (1974). Evidence of Winifred's mental capacity before or after her execution of the will may be considered only to the extent it tends to show her state of mind at the time she executed the will. *In re Greene's Estate*, 40 Ariz. 274, 278, 11 P.2d 947, 948 (1932); *In re Weils' Estate*, 21 Ariz.App. at 282, 518 P.2d at 999.

Four people were with Winifred when she executed her will on February 25, 1981. Clara Skwarczynski, the nurse who attended Winifred on the 7:00 a.m. to 3:00 p.m. shift that day, witnessed the will signing. At the time of trial she had no independent recollection of the event. However, she testified that when she was asked to witness a will, it was her practice to attempt to ascertain whether the testator was alert and mentally competent to sign the will. She indicated she would have done so in relation to Winifred's will.

Elizabeth Phillips, a unit secretary at the hospital, also witnessed the will's execution. When she testified at trial, she also had no independent recollection of the event. However, she stated she had frequently witnessed wills when she was at the hospital. She also stated she would not have signed as a witness if Winifred had been doing anything peculiar or unusual. When asked whether to the best of her recollection, Winifred was of sound mind when she executed the will, Ms. Phillips responded, "She would have had to have been, otherwise I wouldn't have signed it."

Dallas Luc, Attorney Favour's secretary, had taken the will to the hospital and recruited the witnesses. She was present when the will was executed. She testified she had conversed with Winifred and two of the witnesses prior to obtaining a third witness to observe the signing. She read the will to Winifred in front of the witnesses because Winifred did not have her glasses with her at the hospital. However, she may have paraphrased the final paragraph. She described the signing of the will as follows:

Q. Prior to Mrs. Thorpe's signing the will did she tell you that this will was what she wanted or it was not what she wanted?

Did she have any questions about the terms of the will?

A. No. I would have asked her that, if this is what she wanted. She said yes.

Q. She did say yes?

A. Yes.

Q. When she signed the will were the witnesses present along the side of the bed?

A. Yes.

Q. They were in a position that they could see her?

A. All along the side of the bed. Yes.

Q. Did the witness then sign on page 5 in your presence?

A. Yes.

Q. Did Mrs. Thorpe have any difficulty signing her name that day that you recall?

A. No....

Q. How would you describe her mental or cognitive state at that point?

A. She was fine to me.

Q. She was awake?

A. Yes.

Q. Was she alert?

A. Yes.

Q. Did she seem to understand why you were there?

A. Yes.

Q. Where you came from?

A. Yes.

Q. Understood that you were from John Favour's office?

A. Yes.

Ms. Luc also testified that the time involved from when the witnesses were collected until the will was signed was approximately 30 to 35 minutes.

Linda Vandehey, the pre-op nurse who attended Winifred just prior to her surgery, also testified concerning Winifred's mental state on February 25th. Ms. Vandehey testified from her notes on Winifred's medical chart that Winifred "verbalizes and demonstrates understanding." Her job as a pre-op nurse was to instruct patients concerning what to expect during the surgical procedure and the importance of deep breathing post-operatively. Her practice was to go out and ask the patient what they were going into surgery for to determine whether there had been an informed consent. If a patient was unaware of what was going on, even if there was a signed consent, she would tell the doctor of the situation. She also testified:

Q. Okay. Now, in this pre-op demonstration when you asked various questions, essentially, I gather from what you've told us, the patient is required to say things like yes or no or nod in some way?

A. I don't—yes or no. They have to tell us what type of surgery procedure they're going under.

Q. They have to tell you—she would have had to know that a hip—

A. —was broken, that is correct, and we were going to take her back and fix it.

Ms. Vandehey further testified that according to her documentation, Winifred was alert and oriented at the time Ms. Vandehey gave her the pre-op instructions.

### OTHER EVIDENCE

■ Wilbur contends Winifred's lack of testamentary capacity is demonstrated by her medical records spanning a period of time from approximately two months before the will signing until well afterwards. We disagree.

Winifred had been admitted to Yavapai Community Hospital on December 25, 1980 complaining of dizziness and respiratory problems. She was diagnosed as having lower-lobe pneumonia and the dizziness was attributed to an inner-ear infection. From tests performed during her hospital stay which lasted until January 10, 1981, it was also determined that Winifred had arteriosclerosis and aortic sclerosis. After Winifred's discharge from the hospital, she returned to her home where she lived independently until breaking her hip on February 24, 1981.

Wilbur argues that during her hospitalization commencing in February, Winifred suffered from low brain oxygen, anemia, arteriosclerosis, poor cranial blood flow, dehydration and the effects of demerol. He argues the combination of these factors caused her lack of testamentary capacity. Apparently, Wilbur is arguing his mother did not know she was signing a will on February 25. However, he refers to no evidence she was unaware of her property or her relationship with family members.

Several physicians testified at trial concerning Winifred's medical history. Winifred's orthopedic surgeon, Dr. Charles W. Davis, had examined Winifred shortly after midnight on February 24th. He did not see Winifred again until he operated on her at approximately 3:50 p.m. on February 25th.

Dr. Davis testified that a lack of oxygen would have "an effect" on a person's mental ability and could result from arterioscle-

rosis. He indicated a special procedure would be required to determine how much affect such oxygen deprivation would have. However, there is no evidence in the record either that any such "special procedure" was done or that Winifred experienced deprivation of oxygen sufficient to affect her mental ability on February 25, 1981.

On direct examination Dr. Davis testified he did not believe Winifred would have been competent to execute a will on February 25. However, on cross-examination, he stated that although he had written "confused" on her chart on February 24, he believed she had been competent to sign a consent to surgery on that date. He also conceded he could not testify with respect to the three-prong test for testamentary capacity, i.e., whether Winifred knew the extent of her property, her relationships with others and whether she knew she was signing a will on February 25. He agreed he had no medical basis for concluding that the witnesses who observed Winifred sign her will and believed her to be competent were more or less accurate than he was when he concluded she was competent to sign a consent to surgery.

Dr. Inscore was decedent's attending physician from December 1980 until her death in 1983. However, he did not see her on February 25, 1981. He testified that during her hospitalization in December 1980 she was sometimes alert and at other times confused. He also stated that following her hospitalization for the broken hip she appeared to be on a consistent downhill course. He explained that when he first saw her after the hip surgery, she had experienced a medical catastrophe—clots in her lungs—and was confused at that time. However, Dr. Inscore was unable to render an opinion as to decedent's testamentary capacity on the day she signed her will. He was also unable to give a medical opinion on whether Winifred was suffering from organic brain syndrome in December 1980. He agreed she might have periods of complete lucidity.

The evidence is conflicting concerning whether Winifred suffered from anemia during her February hospitalization prior to the surgery itself. Dr. Inscore testified that her blood counts on February 25 prior to surgery were "fairly normal" for a person her age bracket and were within normal limits. Various doctors apparently agreed that had Winifred been dehydrated when she was admitted, her blood count could have been artificially elevated and she *could* have been suffering from anemia although it was not reflected in the tests.

Whether Winifred was dehydrated when she arrived at the emergency room on February 24 is not clear from the record. Dr. Inscore did not give an opinion on whether this condition existed. He noted Dr. Davis had not made any entry on the chart indicating that Winifred was dehydrated. Dr. Davis stated that she "probably was."

Dr. Inscore testified arteriosclerosis can cause a lack of circulation to areas of the brain. However, there was no evidence as to what degree, if any, Winifred's circulation was decreased.

Winifred received a shot of demerol, a narcotic pain killer, on 8:30 a.m. on February 25. Dr. Davis testified that the dosage was moderate and that it would be mere speculation to conclude that the demerol shot lasted more than the customary three of four hours. Thus he could not conclude that the effect of the demerol shot continued until 1:00 or 2:00 p.m. when Winifred executed her will.

The primary support for the conclusion Winifred lacked testamentary capacity is the testimony of Dr. Thomas O'Brien, a forensic psychiatrist. Dr. O'Brien was employed by Wilbur to make a psychiatric post mortem of Winifred's mental state on February 25, 1981. His opinion was based entirely on a review of the Yavapai Community Hospital records for decedent's December 1980 and February 1981 admissions. Dr. O'Brien did not talk to anyone who knew Winifred nor did he talk to any nurse or doctor who made the entries on which he based his opinion.

■ Dr. O'Brien's opinion testimony was that Winifred Thorpe was not competent to

form an intention and have a clear understanding of what she was doing in signing any document on February 25, 1981. The record indicates Lucretia objected to the factual foundation for Dr. O'Brien's opinion prior to trial in her motion in limine, during trial before the court heard his testimony and again in her motion for a directed verdict before the case was submitted to the jury. We thus conclude she has properly preserved this issue for review. *See Gibson v. Gunsch*, 148 Ariz. 416, 714 P.2d 1311 (App.1985); *Verdugo v. Po Shing Gee*, 4 Ariz.App. 113, 417 P.2d 747 (1966).

In any event, Dr. O'Brien's conclusions lacked sufficient evidentiary foundation. While the opinion of a qualified expert on the ultimate issue may generally be sufficient evidence to uphold a judgment, caution is necessary in this area. *See* M. Udall and J. Livermore, *Law of Evidence* § 26 (2d ed. 1982.) Dr. O'Brien's opinion was based in large part upon assuming facts without support in the record.

A nurse's entry on the emergency room records noted, "poor hygiene." From this entry, Dr. O'Brien concluded that decedent was not well-kept. He determined the entry would "most likely refer to a chronic state of not taking very good care of yourself." He used this "fact" as support for his opinion that Winifred suffered from organic brain syndrome as early as December, 1980. Janet Crittendon, the nurse who made the entry, had no personal recollection of the patient's condition, but testified the entry could mean dirty or disheveled clothes, dirty or disheveled hair or a condition likely to result from rolling around on a floor. However, Winifred had been lying on the floor of her home for several hours after breaking her hip before a deputy sheriff could reach her. Other witnesses who knew Winifred testified she was always neat and clean. No one, including Wilbur, testified she was dirty and disheveled.

Dr. O'Brien apparently also concluded Winifred was not taking proper care in cleaning her home prior to her hospitalization. While he first stated this information came from the medical records, he later said that this information came from Wilbur. He had not seen Winifred's home. He took this "fact" also as a behavorial manifestation of organic brain syndrome. At least four witnesses who had seen Winifred's home prior to her hospitalization testified it was clean and neat.

Dr. O'Brien also noted the emergency room records state Winifred's weight was 100 lbs. and that she had no known allergies. In fact, Winifred weighed 80 lbs. and was allergic to penicillin and sulfa. First, Dr. O'Brien assumed decedent gave this inaccurate information to a nurse who recorded it on the admission notes. However, there is no evidence Winifred provided this information. Medical records which were accessible to the hospital at the time Winifred was in the emergency room incorrectly stated Winifred had no known allergies. Nevertheless, Dr. O'Brien concluded Winifred was unable to remember her weight. He testified:

> And what happens is that people get clouded mentally, they tend to give all things that are better down in their memory—that they are better memory tracks for, and we've all seen this in elderly people that can't remember recent events but can remember way far back ones and that is what, in my opinion, was going on when she gave her weight as 100 lbs.

He added this "fact" also to support his view that Winifred suffered from organic brain syndrome.

Dr. O'Brien also concluded Winifred was affected by demerol when she signed the will. This appears to be pure speculation. As previously discussed, Dr. Davis testified a demerol shot generally lasts 3–4 hours but the effects of the drug may vary with factors such as age and liver function. No liver function tests were performed. The only evidence pointed to by Dr. O'Brien to demonstrate that the effects of the drug lasted for a longer period of time were Winifred's age and nurses' notes indicating Winifred had been dozing. These notes were for the 7:00 a.m.—3:00 p.m. shift.

There is no indication of when during the shift the "dozing" occurred.

Dr. O'Brien also relied on Winifred's medical records after her hip surgery. A number of these reports indicated that Winifred was "confused." There is also evidence to the contrary. However, following hip surgery Winifred suffered lung clots requiring her continued hospitalization until May 8, 1981. Moreover, the medical records deal with events occurring long after the will execution and following a major medical crisis which render them too remote to be probative of Winifred's mental condition on February 25.

The fact that there exists a generally deteriorating mental condition or that old age is accompanied by mental slowness and poor memory, does not show lack of testamentary capacity. *Evans v. Liston,* 116 Ariz. 218, 219–220, 568 P.2d 1116, 1117–1118 (App.1977). We must determine whether the medical records and the testimony of Dr. O'Brien go beyond this to support a finding that Winifred did not understand she was signing a will on February 25, 1981. We conclude the evidence fails to reach this level.

A factual situation similar to that of the instant case was considered by our supreme court in *In re Walters' Estate, supra.* The sole issue in *Walters* was the testamentary capacity of the decedent who executed his will while in the hospital suffering from shock. Walters had been injured earlier in the day when his arm and shoulder were crushed and mangled. Prior to being transported to the hospital, he was given an injection of morphine. Upon arrival at the hospital, he was given 100 miligrams of demerol for pain. At the hospital, he asked a friend to perform certain tasks for him. After his arrival at the hospital, Walters inquired about making a will, which he subsequently dictated. The witnesses present before and at the making of the will testified without contradiction that Walters was of sound mind. Unlike two of the witnesses in the instant case, however, these witnesses had independent recollections at the time of trial of the events surrounding the execution of the will.

In opposition to the validity of the will, the contestants presented the expert opinion of a doctor who had not known any of the parties. His evidence was expert opinion evidence based on hypothetical questions. The doctor testified about the diminishing blood supply and said this resulted in Walters' mentality being fogged, and the power of reasoning considerably disturbed to a point where Walters could not have known what he was doing. The doctor also testified that the demerol would have deprived Walters of the ability to know and realize what he was doing at the time he made the will.

The supreme court noted that the description of the patient's hypothetical conditions was not borne out by direct evidence. Moreover, the court noted that the hypothetical questions did not include uncontradicted facts established by other testimony concerning Walters' state of mind at the time he dictated and executed the will.

With respect to the doctor's expert testimony the court stated:

Since Dr. Zinn did not know the testator during his lifetime or treat him during his injury, his opinion of Walters' mental condition when the will was made must be based on the hypothetical questions propounded to him. If these questions did not accurately and completely state the facts, Dr. Zinn's opinion would have no relevancy to the case at bar.

77 Ariz. at 128, 267 P.2d at 900.

Lucretia argues that Dr. O'Brien's opinion, like Dr. Zinn's, is based on inaccurate and incomplete facts and in disregard of uncontradicted evidence of events surrounding the making and execution of the will. Wilbur argues that Dr. O'Brien relied on factual data from medical records and that unlike *Walters* there was no testimony Winifred was rational when she made her will on February 25.

We find that Dr. O'Brien's testimony, while based on a review of medical records, was also premised on assumptions of facts

not in evidence. From those improper assumptions, he inferred that: prior to her hospitalization Winifred did not properly care for her person or home, she did not know basic personal facts about herself and was groggy from demerol when she signed her will. He unquestionably had more factual data on which to base his opinion than the expert witness in *Walters.* However, because so many unsupported factual assumptions also went into his analysis, it cannot be determined whether he could have reached his ultimate opinion without these false underpinnings. As the court said in *Walters,* "[t]he abstract opinion of any witness, of the medical or of any other professon, on testamentary capacity is of no probative force when the facts on which it is based are not fully and correctly stated." 77 Ariz. at 128, 267 P.2d at 901.

We conclude Dr. O'Brien's opinion has no probative value, was legally insufficient to controvert other evidence establishing decedent's testamentary capacity, and should have been stricken and disregarded by the trial court. While there was substantial evidence of Winifred's medical infirmities, there was no evidence that Winifred was without capacity to execute her will on February 25. Thus, there was no evidentiary conflict to submit to the trier-of-fact.

Accordingly, the judgment must be reversed. This matter is remanded to the trial court with directions to admit the will of Winifred Thorpe dated February 25, 1981 to probate and reinstate Lucretia Thorpe as personal representative of the Estate of Winifred Thorpe.

Appellant's request for attorney's fees incurred at trial and on appeal pursuant to A.R.S. § 12–341.01(C) is denied. We are unable to conclude appellee's claim constituted harassment or was groundless and not made in good faith. Further, because of our disposition of this appeal, appellee's request for attorney's fees on appeal pursuant to Rule 21, Arizona Rules of Civil Appellate Procedure, is also denied.

CONTRERAS, P.J., and GRANT, J., concur.

PAUL G. ULRICH was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145–47.