188 Ariz. 562 (1996)
937 P.2d 1368
In the Matter of the ESTATE OF Dorothy I. KILLEN, Deceased.
M.I. MARSHALL & ILSLEY TRUST COMPANY OF ARIZONA, Successor Personal Representative-Appellee,
v.
Marion McCANNON, Personal Representative-Appellant.
No. 1 CA-CV 94-0078.
Court of Appeals of Arizona, Division 1, Department E.
April 18, 1996.
Review and Cross-Petition for Review Denied October 21, 1996.[*]
*563 A. Paul Blunt, P.C. by A. Paul Blunt, Scottsdale, for Appellee.
Marvin Johnson, P.C. by Marvin Johnson, Phoenix, and Lesher & Lesher, P.C. by Robert O. Lesher, Tucson, for Appellant.
OPINION
GRANT, Presiding Judge.
In this appeal, we consider whether a testator who knew the natural objects of her bounty but had insane delusions about some of them that affected the terms of her will had the testamentary capacity to execute a will. We hold that she did not have such capacity and that the evidence supports the trial court's conclusion that the testator's will is invalid due to lack of testamentary capacity.
FACTS AND PROCEDURAL HISTORY[1]
On February 13, 1988, appellant Marion McCannon ("Marion") and his wife, Virgie, arrived in Phoenix from Missouri to visit his aunt, Dorothy I. Killen, the decedent ("Killen"). Four days later, Killen told the McCannons that she wanted to find an attorney to draft a will for her. After driving around, they found two law offices, but the attorneys in those offices were unavailable. At the third office they tried, attorney Frank Collins agreed to draft a will for Killen. Collins did not know the McCannons or Killen.
At Killen's request, the McCannons left the office, and she conferred with Collins for an hour or two. The McCannons took her back to Collins' office the next day, February 18, 1988, for execution of the will. Collins and a couple who operated a shop next to Collins' office witnessed Killen's execution of her will.
In the will, Killen bequeathed only one dollar each to her nephews Russell Edward McCannon and R.C. McCannon and her niece Carolyn Dixon. She bequeathed to Marion McCannon $75,000, a rug, half of $75,000 upon the death of her sister (who was to receive the interest on the $75,000 during her lifetime), all of her personal property, and a pro rata share of her residuary estate. Bequests were also made to other family members and friends. She named Marion as the personal representative.
Killen's husband, Dylton, had died in 1985. They had no children. For many years prior to Dylton's death, Killen believed that he was trying to kill her, was putting poison in her food, and was in "the mob." However, by all accounts, Dylton was a fine man and a loving *564 husband who cared for his wife despite her delusions about him.
Shortly before Dylton's death, Killen began having delusions about Russell, R.C., and Carolyn. Even though these nephews and niece took care of her when her husband was ill and after his death and treated her well, she believed they lived in her attic, or caused others to live in the attic, and sprinkled chemicals and parasites down on her, put her to sleep and then pulled a tooth out and cut her arms and hands with glass, were in the Mafia, and were trying to kill her so they could take her property. Although other relatives tried to dissuade Killen from these bizarre beliefs, she would insist that Russell, R.C., and Carolyn were out to get her.
On February 10, 1988, eight days before she executed her will, Killen was evaluated by Dr. Vinod Patel, a psychiatrist. He diagnosed her as having a delusional paranoid disorder. He noted that Killen's judgment was compromised by paranoid ideas and that her delusional beliefs "can interfere in certain decision making."
Killen was admitted to Boswell Memorial Hospital on March 9, 1988, due to difficulty in breathing and weakness. Because of her delusional and paranoid behavior, Killen was transferred later that day to the psychiatric unit at the Maricopa County Hospital. The psychiatrist who examined her concluded that she was having persecutory delusions, her insight was poor and her judgment was impaired, and she was incapacitated by mental illness. He recommended that a guardian and conservator be appointed for her.
Killen died in March, 1993. Marion applied for informal probate of her February 18, 1988 will. The will was admitted to informal probate, and Marion was appointed personal representative.
Russell, R.C., and Carolyn petitioned the probate court for determination of testacy, removal of Marion as personal representative, and appointment of M & I Marshall & Ilsley Trust Company of Arizona as personal representative of Killen's estate. They alleged that at the time Killen executed the will, she was operating under a mental derangement and did not have the capacity to make a valid will.
The matter was tried to the court in September, 1993. Dr. Patel testified that Killen could not have had lucid intervals because a delusion is permanent and lucid intervals are not possible with that condition. According to Dr. Patel, Killen's delusional disorder affected her ability to perceive her family members and friends. In his opinion, a person with delusional paranoia, when family and friends are involved in the delusions, would be unable to make a valid will.
Dr. Alexander Don, a psychiatrist, also testified. He had examined Mrs. Killen on November 27, 1989, and had reviewed her hospital records, records of other psychiatric evaluations, and documents prepared by some of her family members. In his opinion, on February 18, 1988, Killen was suffering with a psychotic illness termed delusional disorder. He explained that a delusion is a fixed false belief that cannot be disabused by rational argument and that because of her delusional disorder she believed her husband and Russell and R.C. intended to harm her.
Dr. Don further testified that Killen's delusions would have influenced the writing of a will because her belief that individuals close to her were trying to destroy her would have been uppermost in her mind when she contemplated her actions toward them. Thus, he said, her perception of various beneficiaries was not rational or lucid. In Dr. Don's opinion, Killen knew who the natural objects of her bounty were, but she had a misperception of them because of her mental illness.
As contradictory evidence, Marion offered the testimony of Dr. Otto Bendheim, a psychiatrist. Dr. Bendheim never examined Killen, he did not review her hospital records, and he acknowledged that he did not perform a complete psychiatric autopsy but only reviewed the items relevant to the question of her capacity to make a will. He testified that there was no question that the diagnosis of Killen as psychotic, paranoid, and suffering from paranoid delusion disorder was correct. However, he believed that she had testamentary capacity because she knew she was executing a will, she knew the natural *565 objects of her bounty, and she was aware of the nature and extent of her estate.
The probate court found that despite the good care Killen received from Russell, R.C., and Carolyn, she believed they were trying to injure her and take her property. These delusions, said the court, were false and were fixed and unshakable in her mind when she signed the February 18, 1988 will. The probate court found that Killen did not have the capacity to know the natural objects of her bounty and to appreciate her relationships with them. Therefore, it concluded that on February 18, 1988, Killen lacked testamentary capacity as a result of a delusional paranoid disorder that influenced the creation and terms of the will she signed that day and thus the will was invalid. The court entered an order withdrawing the will from probate, declaring that Killen died intestate, removing Marion as personal representative, and appointing M & I Marshall & Ilsley Trust Company of Arizona as successor personal representative. The court noted that each of Killen's nieces and nephews was entitled to one-eighth of her estate.
The court denied Marion's motion for new trial. Marion, as personal representative and in his personal capacity, appealed from the order and the denial of his motion for new trial.
DISCUSSION
Marion poses the issue on appeal as whether a testator's will is valid if she understands the nature of a will, knows the nature and extent of her property and knows the natural objects of her bounty but has a misperception of some of her family members due to insane delusions. He argues that a testator need only have the ability to know the natural objects of her bounty; it is not necessary that she possess an accurate perception of her relationships or have plausible, justifiable reasons for her opinions about her family members.
Marion maintains that, in any event, there was no proof that Killen's paranoid state and nothing else, such as a rational dislike and distrust of Russell, R.C., and Carolyn, produced her hostility toward them. Marion argues that in reaching the conclusion it did, the probate court disregarded Arizona law and substituted a rule that even when a testator is found to have known the natural objects of her bounty, a will may be rejected on a showing that the testator's subjective perceptions of one of those persons has been affected by a paranoid delusion concerning that individual.
The policy of the law favors testacy. In re Walters' Estate, 77 Ariz. 122, 125, 267 P.2d 896, 898 (1954). Thus, the law presumes that a testator had the requisite mental capacity to execute a will. In re Vermeersch's Estate, 109 Ariz. 125, 128, 506 P.2d 256, 259 (1973); Matter of Estate of Thorpe, 152 Ariz. 341, 343, 732 P.2d 571, 573 (App. 1986). The contestant of a will has the burden of showing by a preponderance of the evidence that the testator lacked testamentary capacity at the time the will was executed. Walters' Estate, 77 Ariz. at 125, 267 P.2d at 898. The contestant must produce evidence sufficient to rebut the presumption of testamentary capacity. Id. It is our duty to carefully scrutinize a probate court ruling that a will is invalid and to set aside the ruling if the evidence is not sufficient to support it. Id.
The court considers the testator's capacity as it existed at the time the will was executed. In re Teel's Estate, 14 Ariz. App. 371, 373, 483 P.2d 603, 605 (1971). To invalidate a will for lack of testamentary capacity, the contestant must show that the testator lacked at least one of the following elements: (1) the ability to know the nature and extent of his property; (2) the ability to know his relation to the persons who are the natural objects of his bounty and whose interests are affected by the terms of the instrument; or (3) the ability to understand the nature of the testamentary act. In re O'Connor's Estate, 74 Ariz. 248, 257, 246 P.2d 1063, 1070 (1952); Evans v. Liston, 116 Ariz. 218, 219, 568 P.2d 1116, 1117 (App. 1977).
In addition, Arizona law recognizes that mental illness can render a person incapable of making a valid will if the insanity is so broad as to produce general mental incompetence or a form of insanity that *566 causes hallucinations or delusions. In re Stitt's Estate, 93 Ariz. 302, 305, 380 P.2d 601, 603 (1963); Evans, 116 Ariz. at 220, 568 P.2d at 1118. To invalidate a will, however, the will must be a product of the hallucinations or delusions; in other words, the hallucinations or delusions must have influenced the creation and terms of the will such that the testator devised his property in a way that he would not have done except for the delusions. O'Connor's Estate, 74 Ariz. at 258, 246 P.2d at 1069-70 (quoting In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947 (1932)); Evans, 116 Ariz. at 220, 568 P.2d at 1118. Furthermore, a generally deteriorating mental condition, eccentricities, idiosyncracies, or mental slowness and poor memory associated with old age do not necessarily destroy testamentary capacity. Stitt's, 93 Ariz. at 306, 380 P.2d at 603 (quoting In re Wright's Estate, 7 Cal.2d 348, 60 P.2d 434, 438 (1936)); Thorpe, 152 Ariz. at 348, 732 P.2d at 578; Evans, 116 Ariz. at 219-20, 568 P.2d at 1118.
Arizona does not have a reported case in which a court has found that the testator's insane delusions at the time of execution of the will rendered it invalid. However, application of Arizona law leads to the conclusion that even if the testator has apparent testamentary capacity under the three-prong test, the will is nonetheless invalid if an insane delusion affects the terms of the will related to one of the requirements. The court in Matter of Will of Maynard, 64 N.C. App. 211, 307 S.E.2d 416, 430 (1983) (quoting Wiggins, Wills and Administration of Estates in North Carolina, § 47, pp. 65-66 (2d ed. 1983)), explained this rule as follows:
"If a person has sufficient mental ability to make a will but is subject to an insane delusion, i.e., monomania, as to one of the essential requirements of testamentary capacity, the will would not be valid. For example, if the testator has an insane delusion as to the objects of his bounty, it would invalidate his will.
* * * * * *
An insane delusion must be distinguished from prejudice, hate, bad judgment, ill will, and any number of other conditions which might be associated with sanity. To be sufficient to invalidate the will, the delusion must have no foundation in fact and must be the product of the testator's diseased or deranged mind."
The court in Kirkpatrick v. Union Bank of Benton, 269 Ark. 970, 601 S.W.2d 607, 609 (1980), noted that the settled law is that "while an individual may possess the requisite testamentary capacity, he may, at the same time, be laboring under one or more insane delusions which may have the effect of making his purported will a nullity." See also In re Dovci's Estate, 174 Pa.Super. 266, 101 A.2d 449, 451 (1953) (if testator is of sound mind regarding general dealings but is under insane delusion that affects terms of his will, will is invalid); Matter of Estate of Kesler, 702 P.2d 86, 88 (Utah 1985) (insane delusion that affects one's understanding of the natural objects of one's bounty and materially affects disposition of one's property may invalidate a will).
Accordingly, if the testator is eccentric or mean-spirited and dislikes family members for no good reason, but otherwise meets the three-prong capacity test, leaving the family members out of the will would not be due to lack of testamentary capacity. See Stitt's. However, when mental illness that produces insane delusions renders the testator unable to evaluate or understand his relationships with the natural objects of his bounty and this inability affects the terms of his will, the testator lacks the mental capacity to make a valid will. Thus, we examine the evidence produced in the probate court to determine whether it is sufficient to support the conclusion that Killen suffered from a delusionary condition that affected the provisions of her will. See Thorpe, 152 Ariz. at 343, 732 P.2d at 573 (in will contest, appellate court may properly examine evidence to determine whether it is legally sufficient.)
Two of the psychiatrists who examined Killen, one eight days before she executed the will and the other twenty-one months later, testified that at the time she executed her February 18, 1988 will she was suffering from a delusional paranoid disorder. Dr. Patel testified that her delusional condition was permanent and that she could not have had a lucid interval. Dr. Don testified that it *567 would be highly unusual for Killen to have a lucid day or moment and that delusions never go into remission, even with treatment.
The records of the psychiatrist who examined Killen a few weeks after she made her will show that he found her to have persecutory delusions and to be mentally incapacitated. Although no psychiatrist examined Killen on the day she executed her will, the court may consider evidence of her mental capacity before or after her execution of the will to show her state of mind at the time she executed the will. See O'Connor's Estate, 74 Ariz. at 257, 246 P.2d at 1070; Thorpe, 152 Ariz. at 344, 732 P.2d at 574. Thus, the evidence clearly supports the trial court's finding that Killen was suffering from a psychotic mental illness diagnosed as delusional paranoid disorder on the day she executed her will.
Likewise, the evidence supports the conclusion that when she signed her will, Killen was operating under insane delusions about Russell, R.C., and Carolyn, and her delusions controlled her perception of those persons and her treatment of them in her will. Dr. Patel testified that Killen's delusional disorder affected her ability to perceive her family members and friends. According to Dr. Don, Killen's animosity toward Russell, R.C., and Carolyn was completely based on her delusional belief system, and it was this delusion-based animosity that caused her to leave them only one dollar each in her will. He testified that although Killen knew who the natural objects of her bounty were, due to her illness she had a skewed perception of the roles of those people in her life. Thus, the expert testimony supported the conclusion that Killen's delusions controlled her disposition of her property.
Furthermore, the evidence clearly supports the finding that Killen's delusions about Russell, R.C., and Carolyn were without foundation or basis in fact.[2] She believed that they stayed in her attic, sprayed chemicals and parasites from the attic, were trying to poison her, were trying to take her property, and were in the Mafia. Some of her beliefs were too bizarre to be real. As to those that might be theoretically plausible, there was no evidence that Killen's nephews and niece had ever tried to harm her in any way or to take anything from her. Therefore, the court's finding that Killen's delusional beliefs about her nephews and niece were without foundation or basis in fact is supported by the evidence.
The only evidence contrary to the court's finding was the opinion of Dr. Bendheim that although Killen suffered from paranoid delusion disorder, she had testamentary capacity because she satisfied the three-prong test. However, in light of the law that an insane delusion may render a will invalid despite apparent capacity under the test, the probate court did not err in rejecting Dr. Bendheim's opinion.
As noted above, Marion argues that there is no proof that it was solely Killen's delusions that produced her hostility toward Russell, R.C., and Carolyn. If Killen had not suffered from insane delusions, she might have disliked them for a rational reason. However, Marion's position is rebutted by Dr. Don's testimony. There is no way of knowing what Killen might have felt without the delusions. The evidence shows that Killen's feelings toward Russell, R.C., and Carolyn were controlled by her delusions. Therefore, because this mental impairment did not allow her a rational and lucid view of her relationships, in a legal sense, she did not have the mental capacity required to make a will.
What might have been if she did not suffer from delusions cannot control in such a situation as it would be mere speculation; what does control is the fact that her paranoid delusions prevented her from appreciating her relationships with the natural objects *568 of her bounty. This rule makes it unnecessary to try to determine what was in Killen's mind regarding her family members when she made her will. If the evidence shows that the testator had unfounded insane delusions that affected the terms of the will, the testator lacked the capacity to make a will; no inquiry into the testator's feelings or motivation is necessary.
Marion also argues that the evidence does not explain why Killen's delusions focused on Russell and, to a lesser extent, R.C. and Carolyn. He proposes that it may be because she rationally had come to dislike and distrust them. However, there is no evidence that, at least since the last few years of her husband's life, Killen was able to rationally evaluate her relationships without delusional interference. In addition, although none of the expert witnesses specifically testified as to why Killen's delusions focused on her husband and then on Russell, R.C., and Carolyn, the evidence indicates that her delusions focused on the persons who were closest to her and who took care of her. For example, Dr. Don reported that when he examined her in 1989, she believed that staff members of the care center at which she was then living had rummaged through her possessions, introduced noxious chemical substances into her room, poisoned her food, and bugged her room.
Most significantly for purposes of the will contest, her delusions focused on natural objects of her bounty. If, for example, when she executed her will she had been living at the care center and her delusions had involved only staff at the care center, her delusionary condition would have not impacted her testamentary capacity, and the will might have been valid. However, because her insane delusions focused on natural objects of her bounty and thus materially affected her disposition of her property, the court correctly found the will to be invalid.
In summary, we hold that if at the time of execution of a will the testator knew the natural objects of her bounty but suffered from insane delusions that affected her perception of those persons and the terms of the will, the testator did not have the requisite testamentary capacity and the will is invalid. The evidence before the probate court supported its conclusion that Killen was suffering from such a paranoid delusion when she executed her will and that the February 18, 1988 will is invalid. Accordingly, we affirm the probate court's order declaring the will to be invalid and withdrawing it from probate.
PATTERSON, J., concurs.
WEISBERG, Judge, concurring.
I agree with the reasoning and result of the majority opinion, but write separately to emphasize, in my view, the burden of proof that will contestants must carry.
We are bound by, and follow, the pronouncement of our supreme court that a party contesting a will because of a testator's alleged insane delusion has the burden to prove the existence and effect of such delusion by a preponderance of the evidence. In re Estate of Smith, 53 Ariz. 505, 508-09, 91 P.2d 254, 255 (1939). Generally, this requires that "the trier of fact find the existence of the contested fact to be more probable than not." In re Juvenile Action No. J-84984, 138 Ariz. 282, 283, 674 P.2d 836, 837 (1983). Put more simply, a preponderance is usually determined by the "greater weight of all evidence" presented. Black's Law Dictionary 1182 (6th ed. 1990).
In Smith, however, and in In re Estate of Greene, 40 Ariz. 274, 281, 11 P.2d 947, 949 (1932), the only other Arizona case which discusses insane delusions, our supreme court indicated that a preponderance may be somewhat different in this context. In Smith, the court said that a will would not be set aside unless it "clearly appears" that the testator did not understand the disposition. 53 Ariz. at 509, 91 P.2d at 255. From Greene, we learn that, not only must the alleged delusion be false, but it must be "utterly unfounded" and "unwarranted" from the circumstances. 40 Ariz. at 281, 11 P.2d at 949.
Other states impose similar rules. For instance, both Oregon and Michigan apply a preponderance test to testamentary capacity; see Lacey v. Meindl, 216 Or. 373, 339 P.2d 447, 448 (1959); Gardnier v. Smith, 198 *569 Mich. 203, 164 N.W. 382, 383 (1917); yet both recognize that a will should be upheld unless it is clearly the product of the testator's insane delusion.
In Oregon, an insane delusion must have "absolutely no foundation in fact, and even slight evidence which provides a basis for the [testator's] belief negates the existence of a delusion." Dillon v. Phillips, 92 Or. App. 65, 756 P.2d 1278, 1279 (1988). In Dillon, the testator disinherited his children because he believed that they had lied to and stolen from him. Although his beliefs were wrong, "there were events which could have provided a basis for them" in that the children had been raised by their grandmother and the testator's contacts with them were "infrequent and were best characterized by fighting and mutual abuse." Id. The will challenge, therefore, was denied. Id.
Similarly, the Michigan Court of Appeals has held: "[T]here must be a great deal of proof that the suspicions or belief of a testator are completely unfounded before they can be held to be an insane delusion."
....
... We need only determine whether there was any evidence presented upon which the testator could have based his belief, however arbitrary it might appear to this Court. If there is any evidence, however slight or inconclusive, which might have a tendency to create the testator's belief ... then we must conclude that the belief was not an insane delusion.
Karris v. Frustaglio, 148 Mich. App. 171, 384 N.W.2d 119, 122 (1986) (emphasis added and citation omitted); see also In re Estate of Raney, 247 Kan. 359, 799 P.2d 986, 993 (1990); Huffman v. Dawkins, 273 Ark. 520, 622 S.W.2d 159, 162 (1981).
Accordingly, when deciding whether a will is the product of the testator's insane delusion, preponderance requires more than a mere weighing of the evidence. It requires a court to give controlling weight to any supportable justification that the testator may have had to hold the belief that he or she did. Any other rule would make a will contest too attractive an option for disappointed relatives.
In the instant case, I agree with the majority's result for two reasons. First, there is no evidence in the record to suggest a reasonable basis for Killen's beliefs that Russel, R.C., and Carolyn were in the mafia, lived in her attic and sprayed chemicals and parasites in her home, cut her arms and hands with glass, or tried to kill her or take her property. Second, the expert testimony in this case is extraordinarily probative. Dr. Patel examined Killen almost contemporaneously with her execution of the will and found her to have a delusional paranoid disorder. Dr. Don examined her twenty-one months later and made the same diagnosis. Significantly, neither of these psychiatrists were procured by the contesting parties for the purpose of obtaining testimony. In short, the record contains no supportable justification for Killen's beliefs.
NOTES
[*] Zlaket, V.C.J., of the Supreme Court, recused himself and did not participate in the determination of this matter.
[1] The statement of facts in the opening brief contains few citations to the record. Rule 13(a)(4), Arizona Rules of Civil Appellate Procedure, requires statements of facts to be supported by appropriate references to the record. Accordingly, we have disregarded appellant's statement of facts. See Flood Control Dist. of Maricopa County v. Conlin, 148 Ariz. 66, 68, 712 P.2d 979, 981 (App. 1985).
[2] "[A]n insane delusion is a false belief, for which there is no reasonable foundation, and which would be incredible under the given circumstances to the same person if of sound mind, and concerning which the mind of the decedent was not open to permanent correction, through evidence or argument." Kirkpatrick, 601 S.W.2d at 609. If there are occurrences on which the testator could have based his mistaken belief that he was wronged by family members, the belief does not constitute an insane delusion. See Matter of Estate of Raney, 247 Kan. 359, 799 P.2d 986 (1990).